## Campbell *et al. v.* The Mississippi Union Bank.

A bank whose charter has been declared forfeited by the proclamation of the governor, under the act of the legislature of 1840, has power to sue for and collect its debts.

The act supplemental to the charter of the Mississippi Union Bank, being in aid of the charter, and changing the same only in some of the mere details, is a constitutional and valid act.

It seems that, under the constitution of this state, requiring the publication of a law pledging the faith of the state for the redemption of a loan, and referring it to the next succeeding legislature, the whole law need not be published, but only such portions as are necessary to make known the objects and purposes of the loan.

Where portions of a law conflict with the constitution, but a part is valid, the latter will be sustained and enforced if it can be separated from that which is unconstitutional.

If a bank have power to issue paper for circulation, and there is no limitation in the charter as to the kind of paper to be issued, it may issue post notes, and, when issued, they may circulate as currency.

It seems that a majority of the stockholders in a corporation cannot surrender the franchise by a simple resolution.

Although the Union Bank had no right to issue bank notes purporting that the faith of the state was pledged for the redemption of the same, still it was not such a violation of charter as would avoid a note given for a discount of such paper, inasmuch as the defendant must have known that the bank had no right to make such a contract.

The charter of the Union Bank is a valid act, without the aid of the fifth section, or any other portion, in relation to the pledging of the faith of the state.

IN ERROR from the circuit court of the county of Rankin.

Trial before Hon. B. HARRIS.

This was an action of assumpsit, instituted by the bank, on a promissory note made by B. Campbell and others, dated the 18th of March, 1839, negotiable and payable at the banking house in Jackson, and by the bank discounted. The defendants pleaded six special pleas, as follows:

53*

1. The first plea alleged that, heretofore, to wit: on the 10th day of July, 1840, a holder of one of the notes of said plaintiffs, commonly called a bank note, which said note was of the denomination of ten dollars, and then due and payable by said plaintiffs, presented the same for payment to the plaintiffs, at their banking house in the town of Jackson, state aforesaid, according to the provisions of an act of the legislature of the state of Mississippi, approved February, 21, 1840, and entitled an act "requiring the several banks in this state to pay specie, and for other purposes;" which said note, so presented as aforesaid, the plaintiffs refused to pay, as by said act required; which said payment and refusal being made known to Alexander G. McNutt, governor of the state aforesaid, according to the form and in the manner prescribed by said act; and it appearing to the satisfaction of said McNutt that presentment of said note was duly made, and payment thereof refused by said plaintiffs, the said McNutt, in his capacity of governor as aforesaid, on the 10th day of July, 1840, issued his proclamation, as by said act required and directed, declaring, in substance, as follows: I do, by virtue of authority in me vested by the constitution and laws of the state of Mississippi, declare that all the banking powers and privileges of the Mississippi Union Bank (meaning the plaintiffs) are forfeited; by means whereof, and by force of the act aforesaid, all the powers and privileges and corporate franchises of the plaintiffs became and are forfeited, &c.

2. That the charter of the Mississippi Union Bank was not enacted and passed by the legislature of the state of Mississippi in conformity with the provisions of the 9th section of the 7th article of the constitution of said state, in this, that the supplemental law or provisions of said charter, entitled "an act supplementary to an act to incorporate the subscribers of the Mississippi Union Bank, approved February 15, 1838," the same being a law to raise a loan of money on the credit of said state, and to pledge the faith thereof for the payment and redemption of said loan, was not agreed to by a majority of the members of each house of the legislature of said state, and entered on their journals, with the yeas and nays taken thereon, and referred to the next succeeding legislature, and published, according to the requisitions of said article of the constitution, for three months previous to the next regular election, in

Campbell *et al. v.* The Mississippi Union Bank.

three newspapers of said state; but said supplemental act, making material and fundamental alterations in said charter of said bank, was proposed and passed by the legislature of said state at the regular session commencing in January, 1838, and no previous or future action on, or ratification of said supplemental act was ever had by said legislature, or any prior or subsequent legislature of said state, according to the provisions of said 9th section and 7th article of the constitution of said state.

3. That the note, which was the foundation of the suit in this case, was executed by the defendants to the plaintiffs to secure the payment of a loan made by the plaintiffs to the defendants, in "post notes" issued by the plaintiffs to circulate as money, when, by the law of the plaintiffs' charter, they are required and directed to issue, for circulation, paper payable on demand, and no other; therefore said defendants allege that said contract in law is void.

4. That, heretofore, to wit: on the 8th day of June, 1840, a large majority of the subscribers for stock, the supposed individual and private stockholders in the said Mississippi Union Bank, according to, and in pursuance of, a requisition of the officers of said bank, made by authority of the charter thereof, did assemble at their banking houses of their respective bank districts, appointed by said charter, and by resolutions regularly passed and adopted, said supposed stockholders, being first legally organized, refused to receive the state bonds of said state, issued by the authority of said state, in pursuance of the charter of said bank, for the benefit of said stockholders; said stockholders further refused, and still continue to refuse, to permit said bonds to be sold for their benefit or for the payment of the stock by them subscribed, but ordered and directed that the managers and directors of said bank should deliver up said bonds to the state authorities for said state; and said stockholders further declared and made known by said resolutions, adopted as aforesaid, that they were not in truth stockholders of said bank, nor bound as such said supposed stockholders in said Mississippi Union Bank, by said resolutions renounced all the corporate powers, privileges, rights and franchises conferred on them by the law creating and ordaining said bank, and thereby surrendered to the state of Mississippi the charter of the Mississippi Union Bank, heretofore granted to them by the legislature of said

Campbell *et al. v.* The Mississippi Union Bank.

state, which said surrender of said charter has been duly accepted by said state, by the proclamation of the governor thereof, issued the 10th day of July, 1840, in pursuance of an act of the legislature, entitled "an act requiring the several banks of this state to pay specie, and for other purposes," approved Feb. 21, 1840.

5. That the note sued on, in this case, was executed by the defendants to the plaintiffs to secure the payment of a loan made by the plaintiffs to the defendants, in post notes, issued by said plaintiffs to circulate as money, said plaintiffs having printed upon the face of said post notes *"faith of the state pledged,"* (meaning the faith of the state of Mississippi,) thereby pledging the faith of the state of Mississippi for the redemption and payment of said post notes; which became and was a material part of said contract for said loan, and formed a material part of the consideration to defendants, the parties to the note sued on, in this case; and the said defendants allege that the plaintiffs had not the right, by their charter, to issue post notes for circulation, pledging the faith of the state for the redemption and payment thereof.

6. The sixth plea alleged that neither the entire act of the legislature of the state of Mississippi, first approved on the 21st of January, 1837, and finally approved the 5th of February, 1838, entitled "an act to incorporate the subscribers to the Mississippi Union Bank," the same being an act intended to pledge the faith of the state for the redemption of a loan of money, nor the fifth section thereof, was published, under the direction of the governor of said state, as required by said act and the 9th section of the 7th article of the constitution of said state, for three months previous to the regular election holden on the second Monday of November, in the year 1837, but the same was published in the newspaper called the Mississippian, for eleven weeks only, previous to said regular election, and in the following papers, to wit: the Columbus Argus, Natchez Courier, and Paulding Clarion, each ten weeks only, previous to said regular election, and in no other paper in said state, under the direction of the governor, as required by said act and the constitution of said state, &c.

The plaintiffs demurred generally to each of the foregoing pleas, which was sustained by the court below, and a writ of error prosecuted to this court.

Campbell *et al. v.* The Mississippi Union Bank.

The error assigned is the judgment of the court sustaining said demurrer.

Howard, for plaintiffs in error.

1. The first plea sets out that the charter was not published three months, nor the section pledging the faith of the state. This was a condition precedent, so made by the charter itself, as well as the constitution. It is well settled, that the condition precedent must be complied with, or the act will create no corporation. 10 Wend. 268.

The loan for the stock could only be raised on the credit of the state, and this could not be given except in the way the constitution points out. The charter conferred no authority to take and pay for stock, except by the sale of state bonds. A right conferred to raise capital in one way, is an exclusion of all others.

2. We further maintain, that the whole charter should have been published, and that, inasmuch as the supplement was not published, the charter is void, as that was an inseparable part of the authority. There is no restriction in the language of the constitution itself, by which this requisition is confined to that portion of the law pledging the faith of the state. The mischief to be prevented requires that the whole law should be subjected to the action of two succeeding legislatures, after being published. The phrase of "the law," &c. would, in common parlance, mean the whole law, and not a part of it. This construction is the only one which could explain the meaning of the framers of the constitution, or give to it any sensible or practical operation. For what purpose is the action of two succeeding legislatures required?— That the people might judge of the propriety of incurring a debt, and that the country might be protected in this respect from hasty and unwise legislation. The framers of the constitution intended to put a check upon legislation, and to protect the country from debts incurred by visionary dreamers and speculators in the legislature, by providing that, no law should be passed to raise a loan, unless that law went before the people and received their approbation. The manifest intention of the convention was to bring public discussion and public sentiment to bear upon projects of this nature before they could assume the character of laws. The convention

wisely provided, that no debt should be incurred which the people must be liable to redeem by taxation, unless they deliberately and upon reflection sanctioned the law. The object was not only to protect the people from hasty and fraudulent legislation, but to secure their assent to laws of this magnitude, and to propositions involving their happiness and prosperity in so great a degree. The method adopted by the convention to secure this result, was to publish the project for raising the loan in the journals of the legislature, that the people might pass upon it, and instruct their representatives accordingly as they approved or condemned.

It is contended that, nothing is submitted to the people, but the section of the law pledging the faith of the state. If this be true, then it was only necessary to publish that section in the journals. This would only present the naked question to the country, shall the faith of the state be pledged? It would not submit to the people the inquiry or consideration, for what purposes or ends it should be pledged. The obvious intention of the convention was, that the people should exercise a discretion as to what purposes the loan should be applied. That is manifest from the enumeration of the objects of the loan. Whether the people would approve of raising a loan, or not, would necessarily depend upon the purposes to which that loan was to be applied. How could they judge of that, unless the law making that disposition were also submitted to their consideration? No man could be prepared to assent or dissent to the naked proposition, "shall a loan be raised?" Such a proposition must necessarily carry with it the other inquiry, for what purposes shall a loan be raised? If this be not so, then the sanction of the people amounts to nothing, because it must be had without a consideration of the inducements to consent. It would be made without reflection or consideration, and without in any degree involving that which under all circumstances must operate upon the human understanding in order to produce either concurrence or dissent.

We must then conclude that the convention not only intended that the people should consent to the raising of the loan, but also to the objects and manner of its appropriation. This could not be done, unless the whole law was spread before them in all its essential details. They might be willing to incur a debt

Campbell *et al. v.* The Mississippi Union Bank.

for purposes of internal improvement, but not for any other; they might be willing to make a loan for the establishment of a bank, but would withhold consent for any other end. This shows the absolute necessity that they should pass upon the object of the debt, and consider the purposes to which the loan should be applied, in order to carry out the views of the convention. The same process of reasoning would show the necessity of submitting to the people the manner in which the loan should be applied to the particular object. They might be willing to raise money for one particular work of improvement, and not for another. They might be willing to pledge the faith of the state for a rail road, but not for a canal. They might be willing to pledge the faith of the state for one species of banking, and not for another. They might refuse a loan for a bank, unless it were required to maintain specie payments. They might be willing to raise the money to establish a bank to belong exclusively to private stockholders, or they might prefer that the state should be interested. All this could only be ascertained by submitting the law to them in all its parts which formed the basis of the proposition upon which the faith of the state is sought to be pledged. Nothing less than the whole law would enable them to form such an opinion upon the propriety of the loan, as the framers of the constitution contemplated. It is manifest that the details, the substantial provisions of the law, would enter materially into the inducements to incur the debt. It would in a great degree determine the utility of any given loan.

If it be necessary that the whole law with all its principal features should go before two succeeding legislatures, before the faith of the state shall be pledged, it follows as a corrollary that one legislature cannot alter the fundamental provisions of that law, before the loan is effected. It might safely be assumed that the legislature could not amend it in any particular, because it is for the people to judge whether any provision is proper or necessary. Certainly, the legislature could not alter it in any material part before the negotiation, without the sanction of two succeeding legislatures. To maintain the reverse of this proposition, is to destroy entirely the safeguard which the constitution has provided in this respect.

Inasmuch as the publication of the whole law was a condition

precedent, and the corporation could not be organized without it, the charter cannot be good in part, and valid in part, when the condition has not been complied with; for this condition applies to the whole law, and not to a part only. If the publication of the whole law was necessary as a condition precedent to the organization of the corporation, no corporate franchises are granted either by the original charter or the supplement.

2. Again, we say that the bank cannot maintain this action, because it has been revoked according to the provisions of the act of the legislature of 1840.

It is argued, that inasmuch as the act allows the use of the corporate name in liquidation of the affairs of a bank declared forfeited by the provisions of the act of 1840, that it may still maintain suits. It is admitted that commissioners appointed under the law to administer the affairs of the bank might so use the corporate name. But the corporators cannot, after the bank has been declared forfeited, because their powers are then at an end. The corporation has no other powers than banking privileges, and they being repealed or forfeited by the provisions of the statute, suits cannot be maintained until the commissioners are authorized to act. Instead of demurring to the plea, if the act of 1840 is valid, the plaintiff should have replied, and shown that the commissioners had been appointed and were qualified to conduct the affairs of the corporation.

Neither can the state or individuals be estopped from showing that the defendant is no corporation. Where the state and its policy are interested there can be no estoppel. 5 Am. Com. Law Rep. 93; 5 Mason, 442; 4 Missouri Rep. 305.

We contend, that, treated either as a modification of the remedy, or as an absolute repeal, the act of 1840 is free from constitutional objections.

"No one will doubt that the legislature may vary the nature and extent of remedies, so always that some substantive remedy be in fact left." 3 Story on the Const. 251.

The stipulation on the part of the corporators is, that they will perform their contract with the public upon the pain of forfeiture of charter.

Admitting that the usual remedy of violation of charter is by

*scire facias,* or *quo warranto,* yet it is perfectly competent for the legislature to change the remedy. ·

There is nothing in the constitution of the United States which prohibits a state from exercising judicial functions, nor divesting vested rights, so that the obligation of a contract is not impaired. 3 Story, 267; 2 Peters Rep. 381, 413; 3 Dall. 386; ibid, 308; 2 Peters, 627; 11 Peters.

It will not be pretended that any part of the contract extended to the particular remedy existing at the time of the creation of the charter. The legislature has the right to change the remedy at any time, provided it does not violate any provision of the constitution of the state, which distributes the legislative, judicial and executive powers. By our constitution, those powers which are legislative are required to be confided to the legislature; those which are judicial, to the judiciary; those which are executive, to the governor. The constitution is general in its terms. Its declared object is to confine the three different powers of government to a "distinct body of magistracy." The object of the framers of the constitution was to prevent the same power from making, interpreting and executing the law. The evils growing out of abuses of princes in making laws, and then construing them to suit their own purposes, had been severely felt, previous to the American revolution. The object of the federal constitution, and of our own, was to guard against such an abuse. Such is also the spirit of the British constitution. It will be observed, however, that the distribution of these powers is extremely general. It was supposed that the evil could be avoided more by adhering to a distinct body of magistracy than by a minutely defined distribution of subject matter. It was easy to foresee that many subjects would arise requiring governmental action, which could not be classed as belonging exclusively and distinctly either to the legislative, judicial or executive, but of a mixed character, partaking in part of all three.

Mr. Madison, in the Federalist, p. 227, has commented at length on the nature of this principle, and shown the impossibility of an entire and unqualified separation of these powers.

It is not easy to perceive how this statute, by its provisions, makes either the legislative or executive interfere with the judiciary. The act declares that a certain state of facts shall, in law, be

a forfeiture of a bank charter. It authorizes the executive, upon a sufficient proof made to him of the existence of the facts, to make the forfeiture known by his proclamation. The judgment of forfeiture is a judgment of law—not of the legislature or of the executive. If this act is unconstitutional, so must be the statute authorizing a judgment on forthcoming bonds. In that ·case, the judgment is one of law, upon the finding of the facts by the sheriff, without notice to the opposite party or day in court. It is certainly competent for the legislature to prescribe the notice to suitors, or to regulate it as they may see fit. Such has been the decision of this court. 4 How. 351; 5 How. 574.

The act of the legislature does not deprive the corporation of a right to go into chancery for the preservation of its legal rights, after a forfeiture declared by proclamation. It may do so, and have a trial by jury, if the forfeiture has been declared upon insufficient grounds or upon a wrong finding of facts. The act does not profess to deprive the corporation of any ultimate judicial investigation·of the forfeiture. The law could not be held unconstitutional so long as it leaves a judicial remedy, and a right of trial by jury, open to the corporation. 5 How. 457; 4 Pet. Cond. Rep. 443. It has always been held sufficient, if the *right* of jury trial has not been taken away by the remedy. The act. of 1840 still leaves the right open to the corporation.

If the act of 1840 is to be regarded as an absolute repeal, instead of a modification of a remedy, still we maintain that it is a valid act. It has been insisted that this act is unconstitutional, because it impairs the obligation of contracts.· I deny that a bank charter is a contract. It has never been so decided by the Supreme Court of the United States, or by any other tribunal entitled to high consideration. The charter is a general law of the· land, and has none of the incidents of a contract. It is certainly ·to war with first principles to say that franchises and privileges which are carved out of the general rights and liberties of the community, may be deeded away, and forever placed beyond the reach, regulation or revocation of the sovereign power. Such a principle is strangely at variance with the axiom that government exists for the good of the people, and that it may be altered, changed or modified at their sovereign will and pleasure. What governmental power is

there in this country which has not been, or may not be, in some sort, granted to corporations? And if such grants are to be treated as contracts, and placed beyond the reach of the sovereign power, what rights will be left to the people in the process of time? The universal practice of the states, in making these grants of privilege and special exemptions, and their alarming tendency, have called forth, from chancellor Kent and other distinguished jurists, expressions of alarm and consternation.

It is not possible for a legislature, by a law, to deed away the public rights and liberties, and place them beyond the reach of subsequent legislation. A legislature, in this country, has no natural rights; it has no powers other than those conferred by law. It is the creature of organic law. It possesses only certain trust powers, to be exercised for the public benefit. If it could make irrevocable decrees or laws, it would be the worst species of despotism that ever existed. The principle that the succeeding legislature possesses the same powers as that which preceded it, is one of universal application; and it is fortunate for human rights that it is so. An idea of the divine rights of legislation never existed; and if it had, it would have perished with the doctrine of the divine rights of kings. The notion that one legislature may grant away the rights and powers of the people for all time, and so chain the hands of their successors as to render such folly and wickedness immortal and never ending, is an historical idea, a barbarous relic of the absolutism of an age long since past. An individual cannot deed away his liberties and governmental rights; how, then, can the legislator, who is his mere agent, with special and circumscribed powers? For instance, the citizen could not, for all time, bind himself to support and maintain, as a public system, either a specie currency, one of paper, or a mixture of both. And, even though he should contract for such a purpose, and receive a valuable consideration, still he would not be bound—because such a contract would be in derogation of natural right and abhorrent to every principle of reason and justice. If the citizen cannot barter away his governmental rights himself, his agent cannot do it for him. No man, or community of men, have an interest in government which they can transfer or permanently part with. Government is a thing of to-day. It

Campbell *et al. v.* The Mississippi Union Bank.

lasts no longer than men choose to assent to and abide by it. We have no right to say what men shall agree to make it next year; we have no right to impose unchangeable institutions upon them; nay, we cannot place ourselves in a situation where we may not change for ourselves the government we have set up. I state only well received axioms, and yet the modern doctrine of corporations is destructive of their very foundation and basis.

What are corporate franchises, and from whence do they flow? They are a portion of the rights and privileges of the people; they are sovereign prerogatives, resting in the government of the people for the time being. They may be granted for the time being, for the public good; and the same power which may judge of the expediency of granting them for the general good, has the power of recalling them when the same interest requires it. Such franchises* are but segments of the sovereignty, and cannot be alienated only with the condition of revocation when the granting power may think it expedient.

Mirabeau, in his celebrated speech on the repeal of the church corporations, said, "The citizens have rights, and sacred rights, which even society cannot violate; they exist independent of her; they are the necessary elements of which she is composed; and when they enter into society, it is only to put themselves and all their rights under the protection of those same laws to which they sacrifice their liberty. But particular corporations exist neither by themselves, nor of themselves, nor for themselves; they have been formed by society, and their existence ought to cease the moment they cease to be useful. No human work is made for immortality. Since foundations, still multiplied by vanity, would at length absorb all the estates and all the properties of individuals, we must, and may, at last, suppress that vanity. If every person that ever lived had had a sepulchre, there would have been a necessity for overthrowing those barren monuments, in order to find lands to cultivate, and for removing the ashes of the dead in order to support the living." * * * * * * "After having thus proved that the nation hath a right to create or not create corporations—that it belongs to her to determine whether these corporations ought or ought not to be proprietary—I say, that, whenever such corporations exist, the nation hath a right to destroy

them, as she hath a right to create them. I would say to those who would contest it, that there is no legislative act which a nation cannot revoke; that. she may change, when she thinks proper, her laws, her constitution, her organization, and her mechanism; the same power which hath created may destroy; and, whatever is not the effect of a general will, ought to cease from the moment that will suffers an alteration.  *  *  *  *  *  There is no act of legislation which society cannot revoke."

It is quite clear, as maintained by this great statesman, that corporations do not constitute the elements of civil society; that they can at no time exist within that society, except by its continued consent. I deny that corporate franchises are contract property. They are a donation of privileges to those who enjoy them, out of the sovereign bounty, for the mutual benefit of them and the public. The corporation may surrender the franchise at pleasure, as society may demand it back in the same way. That is not a contract which does not bind both parties equally to performance. If the continuance of the corporation had been beneficial to the public, it would not have been bound to go on, but might have surrendered at any time. The public cannot be bound to suffer a corporation to exist for its own end or profit, unless there is a corresponding obligation on the corporation for the public good. That is not a contract which does not bind both parties.

This corporation has none of the legal characteristics of a contract. If a corporation could be a contract binding on the public except in a qualified sense, there must first be a valuable consideration. The consideration which has been assigned, when no other exists, is the advantages which the public derives from the exercise of the franchise. But this reason only proves that the corporation is an ordinary exercise of legislation, that the grant was made on public considerations, and that therefore public considerations must determine its existence. If it be a contract in that sense, it is not an executed, but an *executory* contract; and as the only consideration is the public good, when that fails, the consideration is gone, and there is no obligation on the state to suffer it to continue. Of that consideration; the public good, and its failure, the legislature alone can be the judge. The judiciary cannot judge of public expediency, and cannot therefore determine whe-

ther the consideration has failed or not. It can only adjudicate the violations of the terms of the charter. It is obvious that there may be a failure of this consideration, the public good, and that there must be somewhere a tribunal competent to pronounce upon it. There is no obligation on a party to abide by a contract after the consideration has failed, and whether executory, or executed, it may be rescinded, if there is any thing left to act upon.

The history of the times which led to this constitutional provision, shows conclusively, that it was not intended to embrace such internal police of the states as corporate franchises. In the introduction to his papers, Mr. Madison speaks thus on the subject:

"In the internal administration of the states, a violation of contracts had become familiar, in the form of depreciated paper made a legal tender, of property substituted for money, of instalment laws, and of the conclusions of the courts of justice, although evident that all such interferences affected the rights of other states, relatively creditors, as well as citizens, creditors within the state." Vol. 12, p. 712. Such also, is the account of this matter which he gives in the Federalist, No. 44. It is plain that the provision of the court was aimed at the evils which had grown out of paper money, tender laws, relief laws, and the then prevalent interference with private contracts. It never was the intention of the convention to abridge the powers of the states *for good government and the protection of the public interests.* And it is extraordinary that the supreme court should have put a forced construction upon the constitution, which has contributed to produce that very state of things which the convention was so studious to prevent. For out of what has grown our calamities, produced by a depreciated paper money, by the reckless abuse of corporate franchises, but this doctrine that these institutions are contracts, and beyond the regulation of the people and their legislatures? Has it not led to relief laws, stay laws, and unjustifiable interference with private contracts and the standard of value? Is it not constantly altering and impairing private contracts?

While the supreme court has thus lent itself to protect privilege by constitutional interpolation, there is scarcely any species of interference with private contracts by means of the remedy which it has not protected and encouraged. Look at your statutes of limit-

Campbell *et al. v.* The Mississippi Union Bank.

ations, by which the obligation is destroyed by a fiction of the law; at your stay laws, by which a contract for twelve months is forcibly made one for twenty-four; your redemption laws, by which the means of payment may be all frittered away. The supreme court permits any species of impairing the obligations of contracts by these means, so that a subsisting remedy is left, however it may postpone, delay, or practically destroy. All this is done on the ground of expediency, public policy, and as a matter pertaining to the general legislation of the country; while the privileges of corporations granted in derogation of common right, which an hundred times more deeply affect the general interests, prosperity, and inherent rights of all classes of society, are protected as contracts, and placed beyond the reach of legislation. Nay, these exorbitant and miscalled rights are to be protected from all molestation, although they should produce the ruin of trade, commerce, and credit, rob industry of its just rewards, and overwhelm the country in general bankruptcy.

One legislature has the same power for the regulation and government of any general interest, as any other, and the framers of the constitution intended to assert no other doctrine. Of this provision of the federal constitution Judge Rawle, in his "View," says: "It does not comprehend the political relations of a government and its citizens; civil institutions which must be liable to change with circumstances, and to be modified by ordinary legislation, those which deeply concern the public, and which to preserve good government, the public judgment must control." p. 137.

The same doctrine is also asserted by Judge Marshall, both in the Dartmouth College case, and in Fletcher *v.* Peck. In the latter case he says:—

"The principle asserted is, that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature. The correctness of this principle, so far as respects general legislation, can never be controverted."

Grotius, 179, c. 14, lays down the rule broadly "that privileges granted by princes to their subjects, much more to strangers, might, according to the times for the benefit of the commonwealth and other causes, be lawfully suspended, yea revoked and made void."

Campbell *et al. v.* The Mississippi Union Bank.

* * * * "Neither is any prince bound by his contracts, when for just cause that contract turneth to the public detriment." "A prince is not bound by any contract, though solemnly made, if it tend to the detriment of the commonwealth; for that a prince is more strongly bound to the commonwealth, than to his own promise."

Judge Story, in the third volume of his Commentaries, p. 258, admits the rule:—"It has always been understood, that the contracts spoken of in the constitution were those which respected property, or some other object of value, and which conferred rights capable of being asserted in a court of justice. That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, is admitted; and it has been so construed."

It cannot be denied that the regulation of the currency is a sovereign power, a branch of the civil government, which deeply concerns the public and every interest which it may possess. It not only vitally affects every branch of business, every foreign and domestic interest, but public and private morals. If there be any one national or governmental care at all times, and especially at this, more general, important and engrossing than another, it is the subject of the public currency. There is no subject which requires such constant attention and absolute regulation by the government, as the currency. In all ages of the world, from the birth of civilization, the currency has been a governmental power, a branch of sovereignty, and a leading subject in civil institutions. Never, until recently, and in our own country, has it been attempted to withdraw this interest from the sovereign power and the control of government, by erecting it into private privilege and emolument, to the absolute destruction of the greatest and best interests of society; by a law of mortmain, to place it forever beyond the reach of the sovereign power of legislation. In ages fruitful in tyrannical privilege and monopoly, the public currency was always left untrammeled in the hands of government. The invention of this crying oppression was left to the fruitful genius of republican America.

All history proves that the regulation of the currency is a sovereign power; and if it did not, the universality of that interest would make it one. Could the regulations of commerce be deeded away to private corporators? Neither can currency, which is the

Campbell *et al. v.* The Mississippi Union Bank.

great standard and regulator of all commerce. Could the regulation of weights and measures be granted forever to a private corporation? Neither can the currency, which is the measure of all values and the standard of all contracts.

If the government of the United States were to grant perpetually, to a private corporation, the right to coin money and fix the value thereof, can it be said that congress could not at any time resume that grant, when it might deem it expedient? It is too plain for argument, that none of the great powers of government can become the subject of an irrevocable grant; and it is also too well established by authority to admit of cavil—yet bank paper is more the subject of currency than coin, and, according to our present system, there is more necessity for its regulation. It has been decided a good legal tender, unless specially objected to; and the issues of our state banks form almost the exclusive currency of the country—yet we are gravely told that this power has been granted away, and is now beyond the reach of control. Suppose it were determined by the government, state and federal, that paper currency is destructive of the interests and happiness of the country, and ought to be eradicated, can it be said that the people and their government are powerless for this reformation, because of the foolish grants of governmental powers to private corporations? Is it possible for any government to divest itself or the people of those rights necessary to secure the well being and happiness of society?

The general division of corporations is into public and private, to which Mr. Ingersol, in his able disquisition, has added another —political. It is asserted that private corporations cannot be repealed; but that public, such as that of towns, cities, and those owned entirely by the state, are within the power of legislation. In my view of the subject, it is entirely immaterial whether the corporation is public or private, so that it be made a depository of any portion of the sovereign power. If the franchise embrace any material portion of the political relations of the government and its citizens; if it be clothed with the exercise of any of the inherent powers of civil government, which are necessary to the paramount good of society, the same power which granted may repeal. In such a case it is immaterial whether the corporation fall within the technical definition of public or private corpora-

tions. And that definition, as at present understood, is both technical and arbitrary; for many corporations, now classed as private, exercise powers of the most extended public and general character. I deny the power of a legislature to grant permanently, to a corporation or an individual, any right or power necessary to be exercised by civil government for the public good. If a convention has granted, a convention may revoke; if a legislature has granted, it may repeal. "It may be doubted," says Chief Justice Marshall, in the case of Fletcher *v.* Peck, "whether there is not, in the present organization of society, some natural limit to the powers of legislation."

It is precisely this limitation upon the rights of legislation and government, upon which I would insist in this case. The right to make currency is not at present a natural right, and is withheld from individuals. It is a right created by society, and rests with the sovereign power, to be exercised for the good of society. It is not in the power of legislators, who are special agents, with defined and limited capacities, to make an irrevocable grant of that or any other portion of the sovereign, inherent powers of government. The authority of the legislature, in the civil institutions of the country, does not extend beyond the time being; and any attempt to create a perpetuity, is an usurpation. I do not deny that a charter, either public or private, is a compact between the government and the citizens; but if the franchise embrace any of the powers of government necessary to the general interests of society, it is not a private contract within the meaning of the constitution. And although it be a contract, it is so subject to the paramount rights of society. All those who take grants of franchises, necessary to good government and civil institutions, receive them with an implied condition that they are to be held for the public good and at the will of the legislature. They take with notice of the paramount rights of society; for government has no greater interest, and cannot convey any more than it possesses. They who receive such grants cannot complain of their termination by the granting power; for it was a necessary incident; they were made only for public reasons, and it is an implied condition that their continuance was as a matter of choice and public expediency. In his reasoning, in the case of Fletcher and Peck, Judge

Campbell *et al. v.* The Mississippi Union Bank.

Marshall said, "A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to re-assert that right. A party, therefore, is always estopped by his own grant." This reasoning was correct as applied in that case, to an attempt to repeal a grant of land, which is a proper subject of private property. But it is no authority when applied to matters of civil government and internal police.

A legislature may create a judicial office, and appoint a judge; it may also repeal the office, and thereby resume the franchise which it has granted—yet the office is a contract between the government and the incumbent for his term, for which he pays a valuable consideration, and by the repeal of which he sustains damage. But he has no right to complain, because he took it with an implied condition that it was subject to be destroyed, if the good of society required it. The officer had an interest in his office, but it was subject to the paramount rights of society and government. So, where franchises have been carved out of governmental powers and rights, deeply affecting the public interests and civil institutions, such as a franchise to make currency, they are held subject to the paramount rights of society. Such a franchise is not, in any correct sense, unlimitted private property, or capable of being made so. It is the inalienable property of society, the use of which government may delegate for the time being for the general good, but which may at any time be resumed when the public interests may demand or the legislature deem expedient. It is a mistake to call such a franchise private property. It is easy to distinguish between a privilege by which property is held, and the property held under and acquired by it. A repeal of the charter does not touch a particle of that property, or any contracts or rights previously entered into under the charter. It resumes only the privilege. I do not deny that a mere private franchise, relating to matters which did not embrace any of the great powers of government necessary to the exercise of civil institutions, and deeply affecting the general public interests, may be treated as a private grant protected by the constitution. But it has never been so decided by the supreme court. Even such a principle has not been determined, much less that a bank charter is a contract. In all the cases where a corporation has been decided to be a con-

tract, the act of the legislature not only repealed the franchise, but divested the property. I am not disposed to deny that a corporation is a contract that the holders of the franchise shall enjoy and be secure in the property which they hold under it. They should be protected to that extent, on general principles, if not by virtue of the constitutional provision in question.

This provision of the constitution was first considered in the case of Fletcher *v.* Peck, 6 Cranch, 87. This was a case where the legislature repealed a previous act granting land, and sought to vest the same in the state.

Terrett *v.* Taylor *et al.* 9 Cranch, 43. This was a case where the legislature repealed a charter, and sought to transfer the property thereof. The court decided that so much of the act as transferred the property was unconstitutional; leaving the question of repeal untouched.

New Jersey *v.* Wilson, 7 Cranch, 164. This was a case of covenant running with the land, which covenant was sought to be violated by the legislature. It was where certain lands were exempt from taxation for a valuable consideration.

Dartmouth College *v.* Woodward, 4 Wheat. 518. In this case the legislature sought not only to amend the charter, but to transfer the private property of the corporators, and to impose a new and different corporation upon the corporators.

Lastly, came the case of the Charles River Bridge *v.* Warren Bridge, 11 Peters Rep. In this case, so far as the right of way was concerned, the old doctrine of the supreme court was overturned, and so the judgment of the court was treated in an article in the North American Review, attributed to Mr. Webster. The right of way was treated as a sovereign power, in which the public were interested, and a free bridge which, from its contiguity, destroyed the value of the old franchise, was held a good grant. The court held, that inasmuch as there was not an express stipulation not to establish another bridge, they would not imply one; but the reasoning and principle of the case went much farther, for they would deny the power of the legislature to make any grant which would abridge the powers of the legislature for good government. The chief justice said:—"The object and end of good government is to promote the happiness and prosperity of the com-

Campbell *et al. v.* The Mississippi Union Bank.

munity by which it is established; and it can never be assumed that the government intended to diminish its powers for accomplishing the end for which it was created." 1 Leiber's Pl. Ethics, 247; 4 Peters Cond. Rep. 443; Rawle, 137; 6 Cranch, 136; Story on the Const. 258.

Is the regulation of the currency a less important matter than that of public ways? Does it not affect the interests of society sufficiently to bring it within the same rule? If it were competent for government to part with this power, so as not to be able to resume it when the public interests should require, an express stipulation to that effect should be embodied in the charter, otherwise an ordinary act of incorporation would not estop the state; because the presumption is in favor of the state, and most strongly against the corporation. In the absence of an express stipulation, the presumption must be that the government has not impaired its powers for general good, and that the corporators took the charter with an implied condition that it should be held subject to that power. The chief justice further lays down this principle:—"No good reason can be assigned for introducing a new and adverse rule of construction in favor of corporations; while we adopt and adhere to the rules of construction known to the English common law, in every other case, without exception." The soundness of this position cannot be doubted. Parliament had a right to repeal any corporation, not because it might violate contracts, for this power has always been denied to parliament, but because corporations related to the general interests and were a part of the civil institutions of the country, and over such subjects parliament was omnipotent. Burke, in his speech on the East India bill, denies the right of parliament to violate contracts, and yet asserts its power over corporations, when they affect the general interests, or relate to civil government. Mr. Hallam, in his Constitutional History of England, maintains the right of parliament to repeal corporations, on the ground of their general public interest, and draws a distinction between them and private rights.

It has been held by high authority in this country, that a bank charter is a public corporation. 9 Wheat. 859; 5 Randolph, 139, 167–9; 1 Ark. Rep. 536; 4 Cranch, 384; 15 J. R. 387.

We further maintain, that although this bank charter may be a

Campbell *et al. v.* The Mississippi Union Bank.

contract, that if it becomes necessary in the regulation of the currency, the state may take it for public uses, and that such taking does not impair the obligation of a contract. Vattell, 111; 11 Peters, 577.

If the individual citizen is in the possession of any privilege that is inconsistent with the general good or happiness of society, that privilege or right must yield. It is upon this axiom that the whole fabric of human government rests. The interests of society and of the state must always prevail over that of the individual. Hence is taken his property, and many other natural rights which would enure to him but for government and society.

It is true, that when private property is taken for public use, it must be first paid for. But a mere right to acquire property under a particular privilege is not property itself; and if it is, it is not a species of property upon which any definite value can be placed. An inchoate right to acquire property cannot be estimated. The repeal of a franchise for that purpose would be *damnum absque injuria.* Who could estimate the injury sustained, or award a pecuniary compensation? The court must presume that this view of the subject prevented any compensation on the part of the legislature, or any means for an assessment of the damages.

We further insist, that the private stockholders have surrendered the charter to the state. The plea alleges, that a large majority of the stockholders, assembled in meetings regularly called in pursuance of the charter, surrendered all their corporate rights and franchises, and that the state accepted the same by the proclamation of the governor, issued under the law of 1840. The demurrer admits the facts, and that the proclamation was issued in reference to the acceptance of the surrender. The only question arising upon the pleadings is the sufficiency of the surrender and acceptance. It seems to be a well established principle of law, that a corporation may surrender its franchise to the state. It is a necessary incident to bodies corporate. This surrender cannot be made to the prejudice or injury of other parties, who are secured by contract; nevertheless, when the corporators from any cause esteem it for their interest to put an end to the corporation and its business, they have an undoubted right to do so. 19 J. Rep. 456; 8

Campbell *et al. v.* The Mississippi Union Bank.

Cow. 391; 6 Ibid. 23; Ib. 169; Ib. 211, 217; 7 Con. Rep. 45, 46, 52; 3 Eq. Rep. 557; 6 Cranch, 192.

Unless there is an express provision to the contrary in the terms of the charter, the majority of the corporators may at any time surrender the franchises. 3 Fairfield, 401; 15 Pick. Rep. 350; 1 Paige, 258.

It would be contrary to every principle of justice and reason, that a minority of the corporation should have it in their power to force the majority, contrary to their wishes, to continue an unprofitable and ruinous business. In the nature of things, the majority must have the right to withdraw their funds, unless there is an express provision to the contrary in the charter. The cases referred to fully recognize this principle. Nor is it necessary that there should always be a direct and formal surrender. An implied surrender will often be sufficient. As in the case cited in the 19 Johns. Rep. it was said, that acts on the part of the corporators which destroy the end and object of the corporation amount to a surrender. Non user for a sufficient length of time has frequently been held a surrender. A surrender does not change any existing liability. The rights of creditors remain the same. But no supposed contract in the case of a bank, between the public and the stockholders, can oblige the latter to continue the business of the corporation longer than they may see fit or find it profitable. 6 Cranch, 192.

In grants under the crown, it was necessary that there should be a formal acceptance of the surrender of the charter; but it will be found that this has generally been held with regard to municipal corporations.

The same rule cannot apply to legislative grants of incorporation for commercial purposes. In such cases no acceptance can be necessary on the part of the state, nor any concurrence in the surrender requisite, unless the state is a stockholder. In the case at bar, the legislature, by an act, had declared that, in the event of a certain contingency, it would resume the franchise. The private stockholders, after the passage of the act, assembled, declared they were not in truth stockholders, and expressly surrendered all their rights and privileges in the corporation to the state, by solemn resolutions. After this had been done, the contingency occurred,

upon the happening of which the legislature had previously declared it would resume the charter. The governor then issued his proclamation, in compliance with the act, and declared that the corporation was annulled—or, in other words, that the state had resumed its grant.

It must be held that the act of the legislature was a sufficient evidence of the wish of the state to surrender its corporate interest, and that the law, together with the action in pursuance of it, was an ample acceptance of the surrender made by the private stockholders. No express act of the legislature to that effect could have rendered the acceptance of the surrender more formal, nor have manifested a stronger concurrence in it.

If it be admitted that a majority of the corporators may surrender, here was not only a majority of the private stockholders concurring in the act, but the state also, which was possessed in its own right of one-third of the stock. The cases already cited show that a surrender may be made otherwise than by deed. If such were not the rule, the vote of surrender by the adoption of resolutions would be scarcely less formal than a deed to that effect. No want of formality could be urged after the acceptance by the state, either express or implied. A surrender by resolution would clearly bind those making it; and an assent on the part of the state, made by competent agents, would be all that would be necessary to render the surrender and acceptance complete.

The Union Bank had no right to issue post notes. Suppose the law were silent upon this subject, the corporation would have no right to issue paper for circulation. A bank has not necessarily the right to issue paper to circulate as money. These corporations were not originally clothed with the power to make currency, which is a sovereign power, and has been only gradually conferred upon corporations by *express grant*. Were a corporation created by a grant of banking powers, it would only have the right of dealing in bullion, bills of exchange, and loans and deposites; for this was the extent of the power at common law. It was the extent of the powers of the ancient banks, and is at this day the extent of the powers of most of the banks of Europe. No individual or corporation has a right to make currency without an express grant from government; for a sovereign power must be ex-

Campbell *et al. v.* The Mississippi Union Bank,

pressly delegated by those in whom it rests. It cannot be assumed even by individuals, and much less by a corporation, which is the creature of the legislative enactment. It is obvious, therefore, that we must look to the charter for the right of issuing money; and that it can issue only that species which is expressly authorized by the charter; and that contracts for loans, in an unauthorized issue, cannot be enforced.

A charter, with the general power of "issuing bank notes or currency for circulation," would not possess the power to issue post notes. It would, in such a case, be confined to what is the ordinary and well understood bank currency. This is paper convertible into specie. Post notes are not currency, in the ordinary acceptation, any more than the notes of individuals. Nothing is currency but coin, or paper payable to bearer, or order, which professes to be convertible into coin. This court has held a return of the sheriff, of payment in *Union money*, to be no satisfaction of an execution, on the ground that it was not money; it was not currency in a legal sense. A post note is not currency, any more than a bond or a mortgage. It is only a security for the payment of currency. A bank cannot possess the power to issue such paper, unless it is expressly conferred. The policy of the law, as well as public policy, requires that bank issues should be payable on demand; and if this bank claims an exemption, it must be able to show it in the law of incorporation.

It is only by implication that the Union Bank has any power to issue paper to circulate as money. It is not given in the section which declares the subscribers a body corporate. Sec. 9, Laws of Mi. 772. In this section, the right of issuing paper is not mentioned. In sec. 18, ibid. 776, where this subject is next spoken of, it is only provided that "said corporation shall not issue any note, bill or check for a less sum than ten dollars." This is all the power which the original charter contains for making bank issues. The 7th section of the supplemental charter, ibid. 788, provides that "the bills of this bank shall be signed by the president and countersigned by the cashier of the mother bank, and shall be obligatory on the company according to the face of the same." It cannot be fairly argued that either of these provisions confer a power to issue post notes. If they give authority to issue at all,

55*

they can only warrant the issue of ordinary bank paper, which is paper payable on demand. The corporation had no right to make a note which was not on its "face" payable on demand. It is obvious, however, that the latter provision refers rather to the denomination of the notes than to terms of payment. The 21st section, ibid. 777, which requires cash payments, and prohibits, under a penalty, the corporation to "suspend payment of any of their notes," must be understood as a prohibition of post notes. Such notes are only another name for the suspension of cash payments. It is an issue which it was the intent and policy of the charter to prohibit. This we know, not only from the act itself, but from the history of the times, and the object of the legislature in creating the bank. Because the charter fails to limit, in terms, the kind of paper which the bank may issue, it does not follow that it may issue any species of paper. The spirit of the charter at least authorizes only demand paper to be issued. But if such were not the case, a general power to issue notes for circulation should be construed to mean the ordinary bank issues, which is demand paper. The court ought not to engraft upon such a grant the extraordinary and unusual right to issue post notes, especially when such a power would be contrary to the public interests and the declared public policy in relation to paper money. The presumption should be, that the legislature did not intend to grant a franchise which would be destructive of the best interests of the country. If such a grant has been made, those who claim it should be able to show it in clear and unequivocal terms.

The charter gave no right to pledge the faith of the state for the redemption of the circulation of the bank, which the directory assumed to do on the face of the circulation they put out. The demurrer admits that this pledge of the state's faith was a part of the consideration, and a moving inducement to the contract. All discounts, therefore, made for such issues, are void: 1. because without the authority of the charter; and 2. because such a contract is forbidden by the constitution. It binds neither the corporation nor third parties. 4 Pet. 436; 2 ibid. 538; 8 Gill & J. 318; 8 Ohio Rep. 285; 2 Cow. 678; 3 Wend. 482; 8 ibid. 484.

It is admitted in argument that the bank had no right to pledge the faith of the state for its circulation, and that, although it assu-

med to do so, it did not for want of power; and that, inasmuch as the defendants must have known, or ought to have known, that the bank could not pledge the faith of the state, therefore the contract is valid and binding on the parties.   In other words, that, because both parties knew that they were violating the charter, therefore the contract is valid and must be enforced.   Such a position is not only contrary to law, but is absurd in itself.   There is no principle better settled than that a corporation must know the powers of its charter, and keep within them, or its contracts will be void.   If knowledge on the part of the members of a corporation, and those with whom it contracts, will excuse, then there is no violation which cannot be made with impunity.   If the position assumed be correct, there is, practically, no limit to corporate powers and franchises.   There can be no violation of charter which will avoid a contract, without knowledge on both sides.

Public policy, in this country as well as in England, has settled, that corporate acts, done without the authority of the charter, are void.   They are void for the reason that they are without any competent authority; and for the further reason that the public interests require that corporations should be rigidly restrained within the franchise.   This cannot be done if the courts enforce contracts contrary to the law of incorporations.   It is, therefore, absurd to say that knowledge on the part of the contracting parties can change this public policy, or confer authority where it is not granted by charter.   The knowledge of the defendants could neither add to nor circumscribe the extent of the legislative grant. The demurrer admits that the bank assumed to make a contract, pledging the faith of the state, when it had no right to do so. Can the knowledge of the parties, that the bank had no right to make this contract, and did not legally pledge the faith of the state, render such a contract valid, which was made without authority and contrary to law?   The fact being admitted that the bank did make this unauthorized and illegal contract, the knowledge of the defendants that it was illegal is wholly immaterial; or, if material, only demonstrates the propriety of avoiding the contract.   The making of an unauthorized contract being admitted, it is difficult to see how the legal consequences can be resisted.

Charles Scott, for defendant in error.

1. The validity of the first plea involves the construction and validity of the act of the legislature passed and approved the 21st of February, 1840, requiring the several banks in this state to pay specie. Vide Acts of 1840.

The court below did not err in sustaining the demurrer to this plea, because the act of the legislature, if intended to embrace the Mississippi Union Bank, is unconstitutional and void, being in violation of her charter, or act of incorporation. The words of the act are general, and in their sweeping and desolating spirit are made to apply indiscriminately to all banks in the state. Vide the act of 1840.

The Mississippi Union Bank is a private corporation, although the state is a stockholder; for the state by becoming a stockholder does by no such means identify itself with the corporation. Vide Ang. and Ames on Corp. p. 21 ,22; U. S. Bank *v.* Planters' Bank of Georgia, 9 Wheat. Rep. 907; Bank of South Carolina *v.* Gibbs, 3 McCord's Rep. 377; State Bank of N. Carolina *v.* Clark, 1 Hawk's Reports, 36.

There is perhaps scarcely a corporation known to the law, but in a popular sense might be termed public, the design of their creation, however often it may be defeated, being that of the public good. All banks more or less partake of a public nature; but still if the stock is owned by private individuals, or partly owned by private persons and partly by the state, they are private and not public corporations. Vide Angell and Ames, p. 21, 22, Dartmouth. College *v.* Woodward; 4 Wheat. Rep. 668; the case of St. Mary's Church, 7 S. and Rawle, 559; 2 Kent's Com. 222, and authorities above referred to; Providence Bank *v.* Billings, 4 Peters Rep. 560; Turnpike Company *v.* Wallace, 8 Watts' Rep. 316. See also the charter of the bank, and prove its private character. State *v.* The Union Bank of Tennessee, 9 Yerg. R.

2. Having established that the Mississippi Union Bank is a private and not a public corporation, the next question which arises in the progress of the argument, is its charter a contract? and if so, what kind of a contract?

It has been settled by repeated adjudications, recognized by every tribunal in the land, that a charter of a private corporation

is an executed contract between the government and the corporators. This principle is so definitively determined that it has resolved itself, by the force and inherent power of its truth, into an axiom of the law, which requires it only to be mentioned to be admitted. The even current of authorities establishing this question, with which every legal mind is imbued, constitute it a self-evident proposition, if I can venture to use such a term in the Janus and mysterious face of the law. Vide Ang. and Ames, 503–4, and authorities there cited.

Here there is a contract made and entered into by the state on the one hand and the stockholders on the other, founded upon a sufficient or valuable consideration, as the provisions of the charter prove. The public good which was reasonably anticipated would flow from the grant, independent of the bonus reserved to the state by the nineteenth section of the original charter, which was afterwards released, was a sufficient consideration for the grant. Besides, the state disrobed herself of her sovereignty, and partook of the meek and lowly condition of a stockholder, of a private citizen, and divested herself of her sovereign character, so far at least as her association with the bank was concerned. Vide Ang. and Ames, 22; 9 Wheat. R. 907.

3. Then if the bank is a private corporation, and its charter is an executed contract, entered into between the government and the corporators, was not the act of the legislature, passed and approved 21st of February, 1840, in violation of the 10th section of the 1st article of the Constitution of the United States, and the 19th section of the Declaration of Rights, appended to the Constitution of the State of Mississippi, which declare "that no state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts." Under this clause of the Constitution of the United States, it has been repeatedly determined that the legislature cannot repeal, alter, or impair the charter of a private corporation, (it being a contract within the meaning of the constitution,) without *the consent* or *default* of the corporation *judicially declared and ascertained.* Vide Ang. and Ames, 502–3–4; Dartmouth College *v.* Woodward, 4 Wheat. R. 518; Fletcher *v.* Peck, 6 Cranch's R. 88; The State of New Jersey *v.* Wilson, 7 Cranch, 164; Terret *v.* Taylor, 9 Cranch, 43; Town of Paulet *v.* Clark, 9

Cranch, 292; Wales *v.* Stetson, 2 Mass. Rep. 143; Enfield Toll Bridge Co. *v.* Connecticut River Co. 7 Conn. R. 53; McClaren *v.* Pennington, 1 Paige's Ch. R. 107; 2 Kent's Com. 245.-6; Green *v.* Biddle, 8 Wheat. R. 1.

Does the act of 1840, then, in any manner attempt to alter, impair, or repeal the charter of the bank? If so, it is unconstitutional and void, unless it was passed with the consent of the corporators, or the state had reserved to herself the power to alter, modify, or repeal the charter at pleasure. No such consent on the part of the corporation is made to appear, and the state has reserved no such power in the grant. Vide the charter, 22d section.

The act of 1840 provides, that the refusal of the bank to redeem any of her issues at a certain time shall be a cause of forfeiture of the charter, and that the governor by his proclamation, upon the fact of refusal being made known, shall declare the same forfeited. Now, does not such a law or act violate, alter, repeal, or impair the contract or charter? The law of the contract is a part of the contract, as the authorities already referred to prove. The law affecting the construction, character and validity of the contract necessarily entered into and formed an essential part of the charter, which the legislature could not repeal without violating the ·Constitution of the United States, and her own Declaration of Rights. Was the refusal to redeem her notes at the time specified in the act of 1840, or at any other time, a cause of forfeiture? It was made a cause of forfeiture by the act of 1840, to refuse to redeem her issues at the time or times therein named. If refusal to redeem then was not a cause of forfeiture under the charter of the bank, or the then existing law governing the construction of the contract, the legislature it is conceived had no constitutional authority to make it one, without the consent of the corporators; because it would be altering or impairing the contract, in violation of the fundamental law of the land. A forfeiture works the dissolution of the corporation, and is in effect a repeal of its charter, a dissolution or repeal of the contract; therefore an act of the legislature which declares a refusal on the part of the bank to redeem her issues in specie to be cause of forfeiture, if it were not so under the provisions of the charter or laws existing at the time of the grant, must be unconstitutional and void. Then,

was a refusal to redeem a cause of forfeiture under the charter, or the principles of the common law? The 21st section of the charter is the only one in it which bears materially upon the question in dispute, which provides "that the said corporation shall never refuse specie payment in the current coin of the United States, or suspend payment of any of its notes, bills, or obligations, or any funds received by it on deposite; and if ever the said corporation shall refuse or suspend the said payment, the bearer or holder of any note or obligation, or any person having the right to demand and receive the same, or receive the amount of any deposites as before recited, shall be entitled to receive and recover damages at the rate of fifteen per cent. per annum." Can it be reasonably contended that this section makes the refusal to redeem the notes of the bank a cause of forfeiture? Its letter and spirit proves the reverse. If the legislature had intended that it should work a forfeiture or dissolution of the contract, here was the place for them to have so declared. But the only penalty or rather consequence which they have annexed to the refusal to redeem, is the fifteen per cent. damages which the holder of the paper is entitled to demand and recover, from the date of the presentment and refusal. The charter says, that the bank shall never refuse specie payment of any of her notes, bills, or obligations, &c. But what is the consequence of such refusal? A forfeiture of the charter? or a dissolution of the corporation? No such thing, but that the bank shall be liable to pay to the holders of the paper demanded and not redeemed fifteen per cent. damages. If they had contemplated that it should effect a forfeiture of the charter, would they have awarded damages to the holders of the paper upon a refusal of the bank to redeem, when a forfeiture would work such distressing results, as the deprivation of all the means which the bank has to meet her debts, as well as the extinguishment of the debts themselves, thereby depriving the holders of the paper of the right not only to recover the amount of the notes, but also the damages specified in the event of demand and refusal. Such would be the effect of any other construction than the one which I give to the section. Would it not be simple to argue that the power which gives the damages for a refusal to redeem also made that refusal a cause of forfeiture of charter, which

forfeiture would divest the holders of the right to recover either the amount of the notes or the damages? Assuredly it would. Vide the charter at large.

Even if a refusal to redeem her notes would have been such a common law default as to produce a forfeiture of the charter, does not the construction, which must be given to the above section of the charter, repel the idea that it was ever intended by the legislature that it should work a forfeiture? Was it not the intention of the contracting parties, the government and the corporators, that the only consequence of a refusal to redeem the notes of the bank, should only subject her to the damages specified in the charter? Vide 1 Stew. Ala. Rep. 30, the State *v.* Tombeckbe Bank.

But was it a cause of forfeiture at the common law? There are several modes by which a corporation, at the common law, may be dissolved; 1. by death of all its members; 2. by limitation, or when the purposes of its creation have been fulfilled; 3. by surrender of its franchises into the hands of the government; 4. by forfeiture. Vide Angell & Ames, 500, 510.

It is said to be a tacit condition, annexed to a grant of incorporation, that the grantees shall act up to the end and design for which they were incorporated; and hence, through an abuse or neglect of its franchises, a corporation may forfeit its charter, as for condition broken or a breach of trust. Vide Angell & Ames, 510; 7 Mod. R. 199; 12 ibid. 17, 18; 3 East, 119; 2 T. R. 515; 3 ibid. 246; 9 Cranch, 51, 52; 4 Wheat. R. 658, 659; 5 Mass. Rep. 230; 6 Cow. R. 196, 211, 217; 1 Black. Com. 485.

But is a refusal to redeem her notes such an abuse of her franchises as would work, even if judicially ascertained, a forfeiture of her charter? Her notes are nothing more than promissory notes. Like natural persons, the charter clothes her with complete authority to issue them; and if the charter had been silent upon the subject of their redemption in specie, the bank would still have been bound, at common law, to redeem them, as a natural person is bound to pay his promissory note in specie, if demanded. The bank, in making and issuing her notes, is clothed with all the powers of a single individual or natural person; and the principles applicable to the enforcement of the one are equally so to the other, except where the charter prescribes a different principle or

Campbell *et al. v.* The Mississippi Union Bank.

rule—which it does not. It has been decided that a refusal to re-deem or pay, by a bank, her notes or issues, unless arising from continued insolvency, is no ground of forfeiture; that the remedy of the creditor would seem to be by action.  Vide Comm'th ex relatione Geo. F. Alberte *v.* Bank U. S., National Gazette, March 25, 1841, also March 27, 1841; the People *v.* the Washington and Warren Bank, 6 Con. R. 216, 217; the State *v.* Tombeckbee Bank, 1 Stew. Ala. Rep. 30.

But, according to the decision in 1 Stew. Rep. (a case in point,) the 21st section of the charter, giving damages upon the refusal of the bank to pay or redeem her notes in specie, repels the notion that such refusal would be such an abuse of its charter as to produce a forfeiture.  Then, does it not follow that the act of 1840, making it a cause of forfeiture, is unconstitutional, because it would, if carried into effect, change, alter and impair the charter or act of incorporation?  Nothing seems plainer.  It is not giving or changing a remedy, but making that a cause of forfeiture, or a condition to the contract, which did not exist at the time the grant was perfected.  Vide authorities last above cited.

If it has been sufficiently proved that the refusal by the bank to redeem her notes, at the time of the creation of the charter, was not a cause of forfeiture at the common law, or made so by the terms of the grant itself, then it is clear to my mind that, according to principle and numerous adjudged cases, an act of the legislature declaring it to be a cause of forfeiture, or such a default as would produce the dissolution of the corporation, would be changing, altering or impairing the charter, by annexing a condition which formed no part of the contract as originally made.  The recent decision of the court of common pleas of Pennsylvania, in the case of the Commonwealth ex relatione George F. Alberte *v.* the President, Directors and Company of the Bank of the United States, reported in the National Gazette of March 25, 1841, is one directly in point—only that the act of Pennsylvania was much more constitutional, if I may so speak, than the act in question. Vide National Gazette.

The charter of the Bank of the United States, granted by the commonwealth of Pennsylvania, provided expressly that the bank should redeem all her issues in specie; and, for a refusal to redeem

them, subjected her to damages, and the corporation to a qualified forfeiture of its charter, if she continue to refuse to pay or redeem her notes for the space of three months, and specified the mode in which the qualified or partial forfeiture might be enforced. The act of the legislature of that state, or rather the resolutions of the legislature, passed the 15th February, 1841, made a refusal by the bank a cause of *absolute* forfeiture, and changed the time for which it might continue to refuse under her charter with impunity, from three months to ten days. The court unanimously, after a grave and masterly investigation, distinguished for acumen and research, decided the resolutions of the legislature to be an infraction of the constitution, because passed in violation of the obligation of the grant. In the charter of that bank, a refusal to pay or redeem her issues, was made a cause of qualified forfeiture; and the court decided that the change of the cause of a qualified to a cause of absolute forfeiture, was in derogation of the contract. In the charter of the Union Bank there is to be found no such cause of forfeiture, either *partial* or *absolute;* and we have shown that it was no cause of forfeiture at common law, unless the refusal was the consequence of continued insolvency—and yet the legislature of Mississippi, in the recklessness of power and its assumption, by a solemn yet empty enactment, have declared such refusal shall be a cause, not of a qualified, but absolute forfeiture, working a perfect dissolution of the corporation, a complete divestiture of rights, and producing all those disastrous consequences which ensue upon a dissolution of a corporate being. The court of common pleas of Pennsylvania also determine that the mere change of time, in which the Bank of the United States, under its charter, could refuse to redeem her issues, from three months to ten days, was a violation of the contract. In the case at bar, if the refusal to redeem, on the part of the Union Bank, could be a cause of forfeiture at the common law, where rules and principles form a part of the charter or contract, yet such refusal must be the consequence or result of continued insolvency; and yet the legislature, by the act of 1840, constitute such refusal an absolute and independent cause of forfeiture—and does it not violate the charter or the law of the contract? Reason responds affirmatively in the clear voice of truth and justice. Prompted by the genius

of the constitution, which is the genuine spirit of liberty, the angel of American law, the response is contained in the plain and unvarnished language of our great charter of freedom: "No state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts."

In the great leading case of Dartmouth College *v.* Woodward, reported in 4 Wheat. 518, the court decided that the act of the legislature of New Hampshire, being merely for the purpose of modifying the government of the institution, by increasing the number of its trustees, was an unconstitutional act, being passed in violation of the provisions of the 10th section of the 1st article of the constitution of the United States. Numerous are the adjudged cases which may be referred to as having a direct application to the question now to be determined for the first time in our state. Vide 4 Wheat. 518; 8 Wheat. 1; 12 Serg. & Rawle, 330; 6 Cranch, 88; 7 ibid. 164; 9 ibid. 292; 2 Mass. R. 143; 7 Conn. R. 53; 1 Paige's Ch. R. 107; 2 Kent's Com. 245, 246. All of which establish, it is believed, conclusively, that the act of the legislature making a refusal on the part of the Union Bank to pay her notes in specie, when demanded, a cause of forfeiture, is unconstitutional and void.

4. But the act of the legislature of 1840 is void and inoperative in other respects. The remedial part of the act, if I may so call it—that is, the portion authorizing the executive of the state, upon certain proof of the bank's refusal to pay her notes, to issue his proclamation declaring the charter of the bank as forfeited, is unconstitutional upon two grounds: first—it is in violation of the charter; and second—it confers a judicial power upon the executive, which he cannot constitutionally exercise.

These points in their order: Let us for a moment entertain the absurd idea that that portion of the act of 1840 which enacts that a refusal to pay specie, on the part of the bank, is constitutional, as being a mere re-affirmance or reiteration of a cause of forfeiture existing at the time the charter was granted—what will it avail the plaintiffs in error? Has the charter of the bank become forfeited by the force and virtue of the proclamation of the executive? Not at all, if that portion of the act under which he issued his proclamation is inoperative or void. Now, I shall not attempt to

argue that the legislature have no power. to change the remedy where it does not affect the obligation of the contract; but I shall strenuously contend that any change of remedy which violates, impairs or alters the contract, the legislature have no power to make. This principle is well settled. Then, does the remedy proposed in the act alter, impair or otherwise violate the contract? I have shown that the law of the contract is a part of the contract. In the construction of the 10th section of the 1st article of the constitution of the United States, as already shown, the courts of the country have decided that it is not within the province of the legislature to repeal, alter or impair a contract against the consent or without the default of the corporation, *judicially* ascertained and declared. Vide Angell & Ames, 503, and authorities there cited.

Admitting, then, that the refusal of the bank to redeem her notes was a sufficient *default* to occasion, if enforced, a forfeiture of her charter, still that default, under the construction of the above section of the constitution of the United States, must be *judicially* ascertained; therefore, if the legislature provides any remedy to enforce the cause of forfeiture, the default, other than a judicial remedy, the act creating such remedy is void. As to how a forfeiture is to be enforced, vide Ang. & Ames, 510, and authorities there cited.

The proclamation of the governor is not a judicial mode of ascertaining,. in the meaning of the Constitution of the United States, a cause of forfeiture, and therefore. the act creating a new forum, unknown to the contracting parties, and which is not judicial, is unconstitutional. The legislature may change the remedy for enforcing a violation of the charter, and forum for ascertaining such violation, from one judicial tribunal to another, but cannot confer a judicial power upon the executive of the state.

And this is prohibited by the 1st and 2d sections of the 2d article of the Constitution of Mississippi, which provide "that the powers of the government of the state of Mississippi shall be divided into three distinct departments, and each of them confided to a separate body of magistracy, to wit, those which are legislative to one, those which are judicial to another, and those which are executive to another. No person or collection of persons being

Campbell *et al. v.* The Mississippi Union Bank.

of one of these departments, shall exercise any power properly be-
longing to either of the others, except in, the instances hereinafter
expressly directed or permitted." Vide Hutch. and How. Dig. 19.

Does not the act of 1840 violate the above sections of the con-
stitution of the state? The mode of proceeding or remedy against
a corporation to enforce a repeal of its charter, or a dissolution of
the body, for cause of forfeiture, is by scire facias, or an information
in the nature of a quo warranto. Vide Ang. and Ames, 469, 511;
3 ·T. R. 244–5; 2 Kent's Com.

These remedies are judicial to all intents and purposes. The
proceedings to enforce a forfeiture of a bank charter, or to effect
the dissolution of a corporation, must be instituted in a court of
law alone, unless cognizance of such matters be given expressly to
a court of chancery. Then no matter by what remedy you en-
force the forfeiture, that remedy must be enforced judicially. Call
the remedy by what name we will, scire facias, quo warranto, tres-
pass, proclamation, or any thing else, the remedy can only be en-
forced by the exercise of judicial authority. The dissolving of a
corporation, or declaring a forfeiture of its charter, is the province
of the bench, the exercise of judicial power. Vide Angell and
Ames, 511, 512. It also violates right of trial by jury.

Then it follows that the proclamation of the governor of this
state issued on the 10th of July, 1840, in obedience to the requi-
sitions of the act of the 21st of February, 1840, requiring the se-
veral banks to pay specie, &c., is of no force or effect whatever,
because the act under which said proclamation was issued, con-
flicts with the 1st and 2d sections, article 2d, of the Constitution
of the State of Mississippi, and therefore void.

Thus I think I have shown that each and every part of the act
of 1840 is unconstitutional; that it was passed in violation of the
10th section of the 1st article of the Constitution of the United
States, the 19th section of the Bill of Rights of the Constitution
of Mississippi, and also the 1st and 2d sections of the 2d article of
the Constitution of the State of Mississippi. And what more re-
mains to be said, but that however delicate the responsibility of
declaring an act of the legislature unconstitutional, still when it
does violate any of the great and fundamental principles of gov-
ernment, this court will not hesitate to pronounce the act void.

56*

Campbell *et al. v.* The Mississippi Union Bank.

2. The second plea, which alleges that the charter of the bank is void, in this, that the supplemental law or act, passed and approved on the 15th of February, 1838, was not passed and approved in accordance with the provisions of the 9th section of the 7th article of the Constitution of Mississippi, the same being passed to raise a loan of money, upon the faith and credit of the state, is bad, and therefore the court did not err in sustaining the demurrer to said plea. See 9th sec. 7th art. Const. How. & Hut. Dig. 33.

There is no portion of the supplemental charter of the bank, passed and approved the 15th of February, 1838, which proposes and provides that the credit and faith of the state shall be pledged to raise a loan of money, and of course the supplemental act is not unconstitutional upon any ground alleged in the plea. See the Supplemental Law, Acts of 1838.

The 9th section is the only one in the act which has any reference whatever to the execution of the state bonds, and that does not provide for their execution, and consequently does not propose raising a loan of money, upon the faith and credit of the state. The execution of the bonds were already provided for in the original act of incorporation, passed and approved the 21st January, 1837, and which was re-enacted and approved the 5th of February, 1838. Vide original Charter, Acts of 1837–8.

The 9th section of the supplemental law or charter only empowered the president and directors of the bank, or its managers, to appoint commissioners to *sell* the state bonds, provided for in the 5th, 6th, and 7th sections of the original charter, therefore the supplemental act or charter, makes no provision for the *issuance* or execution of the bonds, but merely authorizes the bank or its managers to appoint commissioners to procure their sale, when issued. The plea then is bad, because the supplemental charter did not require under the constitution the action of any subsequent legislature, or any thing more than the action of the legislature which granted it, and the sanction of the executive, to give it the force and effect of a law or grant.

But let us suppose that the supplemental charter does or did propose to raise a loan of money upon the faith and credit of the state; or that our demurrer to this plea enables the plaintiffs in error to travel back in the pleadings to the declaration, and deny

the existence of such an institution as the Mississippi Union Bank, because the 5th, 6th, and 7th sections in relation to the state bonds were not approved and passed in accordance with the provisions of the 9th section of the 7th article of the constitution of the state. However true such supposition might be, it could not, it is confidently believed, affect the right of the bank to recover in this case. If the Mississippi Union Bank could exist as a corporate body, independent of either the supplemental law, or the 5th, 6th and 7th sections of the original act of incorporation, which I propose to prove, then the bank would have a perfect legal and constitutional right to sue and be sued, plead and be impleaded, to contract and be contracted with, or in short to do and perform any and every thing within the range of the powers expressly granted, or which would not be repugnant to the design and purpose of its creation. It will not be denied, that if the bank could constitutionally exist as a corporation or body corporate by virtue of its original charter, whether the 5th, 6th, and 7th sections of the charter were passed and approved in accordance with the requisitions of the constitution or not, the plea of the plaintiffs in error must be bad, because the bank could still have a legal and constitutional being, independent of the provisions of these several sections in the original charter, and the whole of the supplemental act.

In the construction of a statute or a contract, we must look to the whole provisions of the act or terms of the contract, to ascertain its meaning. The construction of a statute, like the operation of a devise, depends upon the apparent intention of the maker, to be collected from the particular provision or the general context. Vide Devarris on Statutes, 9 Law Lib. 689, marg. Ib. 690; 1 Black. Com.; 1 T. R. 313.

Then let us look to the apparent intention of the legislature in granting the original charter, the intention of the contracting parties, (for we have shown that the charter is a contract,) to be collected from the particular provisions or the general context. Was it the intention and meaning of the legislature, the grantors of the charter, that the bank should not go into operation, or have any corporate existence until the 5th, 6th, and 7th sections of the original charter were perfected acording to the constitution. Those sections were inchoate parts of the grant or contract; they confer-

red a right initiate to the stockholders not consummate, to have the assistance of the state by the means of her bonds to facilitate her in the loan contemplated to be made by the corporators. But were not the other sections of the charter, grant, or contract complete, and fully ratified by the action of the legislature which passed them, and the approval of the governor? Assuredly they were, for no one at this day can doubt the right of the legislature to incorporate a bank; and could not the bank have gone into effective operation without the aid contemplated in these sections? Was there any restrictions imposed upon the corporators, or acceptance of the grant, until those sections might become constitutionally a part of the contract? None. Could not the stock have been subscribed for before a second legislature approved these sections? Vide 5th, 6th, 7th, 9th, 12th, and 14th sections of original charter. Vide Acts 1837-8.

For whose benefit were the bonds intended? For that of the bank—the stockholders, for the 5th section enacts that, "in order to facilitate the said Union Bank, for the said loan of fifteen millions five hundred thousand dollars, &c., the faith of the state is hereby pledged, &c." The charter does not provide against the bank going into operation until the final passage of these sections, but the legal construction of the whole charter is, that the bank may do so; and although the charter is silent upon the subject, yet a thing which is within the intention of the makers of a statute is as much within the statute, as if it were within the letter. Devarris on Statutes, 691.

But the charter of a corporation is a contract, and although the fifth, sixth, and seventh sections of the charter be unconstitutional and void, the other portions of the charter are constitutional, and, if independent of those sections, may go into effective operation. It is well settled that one part of a statute may be void, and the other good—one section of a law unconstitutional, and another good. Devarris on Statutes; 1 Black. Com.

But here is a contract between the state and the stockholders, and if one part can stand independent of the other, it shall do so. Comeyn on Contracts; Chitty on Contracts, 70, 76, 536, 538, and authorities there cited.

Then, if the bank could go into operation without the provis-

ions as contained in the fifth, sixth, and seventh sections of the charter, the whole charter, law, or contract is not void; but the bank is a legal corporate being, and may enforce her contracts. Vide charter at large.

Then, under any view of the question, the plea is bad, and the demurrer to it was legally sustained.

3. The third plea involves the question whether or not the bank had the right to issue post notes. The plea alleges that the note sued on in this action was executed to secure the payment of a loan made to the defendants below, in post notes of the bank, issued to circulate as money, when the bank by its charter is only authorized to issue its paper payable on demand. It will be remarked that the plea does not allege that the notes were depreciated in market, or that usurious interest was reserved upon the note discounted, and therefore the contract or note sued on is not sought to be vitiated upon the ground of usury, but merely upon the ground that there is a want of consideration, in this, that the bank had no authority to issue the post notes which were loaned to the defendants, and for the payment of which they executed the note sued on.

In examining the right of the bank to issue and discount *post notes,* we must look to the act of incorporation itself, to ascertain whether it be forbidden or not, or whether the power is expressly or impliedly granted. The rules of construction of contracts or charters are familiar and simple, and the only difficulty which can arise will be found in their application. Angell & Ames, 139–40.

There is no prohibitory statute touching the exercise of such a power, nor does the charter, in any portion of it, either expressly or impliedly, prohibit the issuance of this species of paper. Vide the charter at large.

But, on the other hand, the right of the bank to issue post notes, if not expressly, is impliedly given, as necessary and incidental to the express granted powers. To sustain this position we need do little more than to refer to the broad and almost unlimited capacities with which the bank is clothed. Vide the 7th, 9th, and 18th sections of the original charter, and the 7th section of the supplement.

The only proper and legitimate construction upon the 9th sec-

tion, or enabling clause of the charter, taken in connection with the other sections above referred to, is, that it clearly confers the right to issue post notes. The power " to loan, to negotiate, and discount upon such terms and such securities as the bank shall judge proper," includes the right. The powers granted are general, and unless restrained by the charter, or some prohibitory statute, the bank can lawfully issue either demand or post notes. The eighteenth section of the original charter recognizes the power of the bank to issue bills, notes, and checks, for it provides that the bank "shall not issue any note, bill, or check for a less sum than ten dollars." Vide 18th section.

The words note, bill, or check, are known to the law and the commercial world as general terms, embracing all kinds of notes, bills, or checks—notes, bills, and checks payable on demand, at sight, or after date—notes payable either with or without negotiable words. Bank notes are promissory notes in contemplation of law, and a note payable after date is as much a promissory note as one payable on demand.

The 7th section of the supplemental charter also refers to, and admits the right to issue bills and notes. Vide 7th section of supplement.

But it will be contended that the 21st section of the original charter contains an implied prohibition upon the right to issue post notes. It provides that the bank shall never refuse specie payment, or suspend payment of any of her notes, bills, or obligations, &c. Vide the 21st section.

What is the meaning of the phrase, " never refuse specie payment, or suspend payment of any of her notes, &c?" It means that the bank shall always, when demanded, pay specie for her demand notes, and shall never refuse to redeem any of her issues when they become due, or suspend their payment. If rightly understood, it cannot be tortured into a prohibition as to the issuance of post notes.

The bank, by virtue of its charter, can exercise almost any power with which a natural person is clothed. Vide 9th section of original charter; Ang. & Ames, 132, 136, 140, 146, 58; 3 Barn. and Alderson, 11, 12; 5 Ib. 204; 16 East Rep. 6.

A bank, keeping within the scope of its general powers, may

Campbell *et al. v.* The Mississippi Union Bank.

control or bind itself to do any act, *at any place*, &c. Why not then issue notes payable *at any time* after date? Angell & Ames, 148; 3 Cow. Rep. 684; 6 Conn. Rep. 420.

But if even the court should be of opinion that the bank had no such right under her original charter, still I contend, as I think with reason, that the act of the legislature passed and approved 13th May, 1837, gave her the power to issue post notes. Vide the provisions of that act, H. & H. Dig. 218.

That act provides then that all banks heretofore chartered in this state shall have the privileges of issuing post notes, upon the condition therein specified. The bank followed and observed these conditions in the issuance of her post notes, all of them bearing five per cent. interest from their date, and none of them having a less time than six, nor a greater time than thirteen months to run to maturity. The bank was not bound to accept of the act of May, 1837, as a supplement to her charter; but if she had no power under her then existing charter to issue post notes, and she issued them notwithstanding, her power was derived under the act of May, 1837, for the issuance of the notes was tantamount to an acceptance of the act as a supplement to her charter, for the act expressly provides that such issuance shall be deemed an acceptance of it. Vide How. and Hut. 218, sec. 14.

But the question is, had she the power to accept of the act of May, 1837? or in other words, does the act conferring the privilege upon, "all banks heretofore chartered" embrace the Mississippi Union Bank? for if it does, then it follows she had the power to accept of the act as supplemental to her charter, and had the privilege of issuing post notes in accordance with its provisions. Do the words of the act, "it shall be lawful for the banks heretofore chartered within this state to issue post notes," &c. embrace the Mississippi Union Bank? or was the Mississippi Union Bank, a bank chartered within the meaning of the act, at or before the time of its passage? The bank it is true had not then gone into operation, the stock had not been subscribed for, and consequently the charter had not been accepted; but still it was a grant of a charter, an act or law of incorporation. If it was a charter, what kind of charter was it? A bank charter, for it can be denominated nothing else. The Union Bank was not at the passage of the act

a corporate body; but there is a material distinction between a body corporate and a charter; the latter is necessary to the existence of the former, and must precede it; but is not the charter, in common parlance, a bank charter? Do not then the words of the act embrace banks not in operation as well as banks in operation? What meaning is to be attached to the words, "the banks heretofore chartered?" Do they not mean all kinds and description of banks chartered, banks chartered and in operation and banks chartered and not in operation? If such be not their interpretation, why did the legislature insert the word *chartered?* why not simply enact the banks in this state? &c. for no bank could exist without a charter. But the act says, "the banks heretofore chartered," which are words of description, embracing all banks which had been chartered, whether they had been put in operation before or after the passage of the act.

Then was the Union Bank a bank chartered at or before the passage of the act? The original charter of the bank was passed January 21st, 1837. All of the charter, except the 5th, 6th, and 7th sections was a complete law, for it did not require the action of two distinct legislatures to pass it, and if the 5th, 6th, and 7th sections were not absolutely necessary to the existence of the bank, or if the rest of the sections of the charter did not depend upon them, but the stock could have been subscribed for, and the charter accepted without those sections, then it follows that the Union Bank was a bank then chartered. Vide the charter at large, and prove that the above is the true construction.

The bonds of the state provided for in those sections, were only intended to facilitate the stockholders in making the loan contemplated in the charter; and who will contend that the stock could not have been subscribed before, and the charter accepted, before the final and constitutional passage of those sections? Vide 9th, 12th, 14th, and 47th sections of charter.

But there is another view which this part of the case presents. Suppose the court should be of opinion that the act was intended to embrace banks actually in operation, or bodies corporate, still it is contended by the force and operation of law, by virtue of the provisions of the charter itself, although the stock was subscribed for and the bank went into active operation after the passage of

the act of May, 1837; the moment, *eo instanti*, the stock was sub-. scribed, and the charter accepted, its corporate being commenced, not from the time of the completion of the subscription, but from the hour of the passage and approval of the charter; for the 9th section of the original charter expressly provides, that the subscribers of the Mississippi Union Bank be created a body corporate for and during the term of forty years from its passage. See 9th section of charter.

Then it was not only a bank chartered, but in contemplation of law a bank in effective operation at the period of the passage of the act of May, 1837, and therefore embraced in the words of that act, "the banks heretofore chartered."

Besides, although the bank may have had no power to issue post notes, still can the plaintiffs in error refuse to pay their note on this ground; it is with the legislature to enforce the prohibition, by causing the charter to be revoked; when they shall determine it has been abused. Ang. & Ames, 146; 16 Mass. Rep. 102.

A cause of forfeiture cannot be taken advantage of or enforced against a corporation collaterally or incidentally or in any other mode than by a direct proceeding for that purpose against the corporation. Vide Ang. & Ames, 510.

If a corporation exercises a power which is not expressly or impliedly granted, but which is not prohibited by its charter, or some statutory regulation bearing upon it, the exercise of such power will afford no ground for a defence in an action upon the note or instrument in the issuance of which the corporation abused their powers. Ang. & Ames, 510, 146, 141; 16 Mass. R. 102; 9 Mass. Rep. 423; 1 Metcalf's Rep.

It is contended then, it is thought with much reason, that inasmuch as the issuance of post notes is not forbidden or prohibited either by the general law or by the act of incorporation itself, it does not lie in the mouth of the plaintiffs in this case to avoid their contract, upon the ground that the note sued on was discounted in bank, the proceeds of which were paid in post notes. The contract as between him and the bank was made on a sufficient consideration.

Let us suppose that it was necessary and requisite, under the provisions of the 9th section of the 7th article of the constitution

of this state, that not only the 5th section of the charter of the bank should be published, &c., but that the entire charter itself should be published also, in order that the people might judge and consider of the reasons and conditions upon which it was proposed to pledge the faith of the state. What does the argument amount to? Is it of any avail to the defendants below? The argument proves only this, if it prove any thing, that the faith of the state was not duly or constitutionally pledged, therefore the state is not bound to redeem her bonds. It does not establish that there is no bank, for the faith of the state may not have been pledged. The bonds may be all void, and still the corporation exist, capable of sueing and being sued. The defendants must show something more than the fact that the state faith was not pledged, &c. They must establish that the bank could not legally exist with the pledged faith or credit of the state; that this pledge constitutionally given was a condition precedent to the grant or charter conferring banking powers. This seems too plain for serious argument.

The 4th plea, like its predecessors, is without a solid foundation, and must share a similar fate. What though the stockholders did meet and resolve that they would not receive the state bonds, and order the managers and directors of the bank to deliver up said bonds to the state? Can it be seriously argued that such a meeting and such a resolution would operate as a dissolution of the corporation? Assuredly not; and it is idle to argue this part of the plea. But it is alleged in the plea that a majority of the stockholders renounced their corporate privileges and immunities, and thereby surrendered the charter of the bank, which was virtually accepted by the proclamation of the executive. Suppose for a moment that a majority of the stockholders could surrender the charter, how must the surrender be made, and how accepted? As to how the surrender of a charter could be made in England, Ang. & Ames, 507, 508.

In this country no particular mode is mentioned in the authorities. Ib.

But a mere resolution of the stockholders would not be a legal surrender. Ib.

But a surrender is not perfect until accepted. There is no ac-

Campbell *et al. v*. The Mississippi Union Bank.

ceptance here.   The proclamation declaring the charter forfeited, cannot be tortured into an acceptance of a surrender.   It is a mere declaration of forfeiture.   Ang. & Ames, 508, 509, et seq.

The 5th plea involves the same question as the 3d—the right to issue post notes—with this difference, that it alleges that the faith of the state is pledged for their redemption, as appears upon the face of the notes.   Suppose the bank had no positive or implied authority to pledge the faith of the state for their redemption, how can the words, being stamped upon the notes, *the faith of the state pledged*, vitiate the contract sued on?   It could form no part of the consideration of the note sued on.   The charter is a public law, presumed to be familiar to every body, and if the defendant received the post notes supposing that the state's faith was legally pledged for their redemption, he took them under a mistake of law, and not a mistake of fact.

G. S. Yerger, on the same side.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The defendants in error instituted suit against the plaintiffs in error on a promissory note, dated the 18th of March, 1839, and due nine months after the 19th of April, 1839, negotiated and payable at the banking house of the Union Bank, at Jackson. The defendants below pleaded six special pleas, all of which, for different reasons, bring directly in question the right of the Union Bank to recover on notes discounted by the bank for the accommodation of the makers.   To all these pleas the plaintiffs below demurred, and the court sustained the demurrers.   The defendants failing to plead further, judgment was rendered against them, to reverse which this writ of error is brought.

Each plea presents a distinct question for the consideration of the court; some of them deny the constitutional existence of the corporation, and others set up a forfeiture of the corporate capacity, and deny the right of recovery.

After a few preliminary remarks, we shall proceed to the several questions which have been so ably and lengthily discussed on both sides.   On the one side it has been contended that the bank

charter is unconstitutional. On the other, that the act of 1840, requiring the banks to resume specie payments or forfeit their charters, is unconstitutional.

It is at all times a delicate judicial duty to declare an act of the legislature unconstitutional. In doubtful cases this should be avoided; but if an act be palpably unconstitutional, the question should be met with firmness. The constitution is the paramount law—the supreme rule—to which all others must yield, and it operates with equal force on the different departments of government. To the legislature belongs the power of making laws, and it is for the judiciary to expound them. We must presume that all laws were designed for the public good; hence, whatever our opinions may be in regard to the good or bad policy of a law, we must sustain it, if possible. With the consequences we have nothing to do. And the good or bad effects of a law in its practical operation, can have no weight in deciding whether it be constitutional. We must look at it as it was made, and judge of it *as it* would then have been judged. We cannot treat lightly that which the legislature has solemnly determined to be politic and necessary, although it may have become odious. Having premised thus much, I shall proceed in the matter presented in the several pleas, taking them up as they stand on the record.

The substance of the first plea is, that on the 10th day of July, 1840, the holder of a note of ten dollars, made by the bank, presented it at the bank and demaded payment in specie, which payment the bank was bound to make according to the provisions of the act of the 21st of February, 1840; that payment was refused, which refusal being made known to the governor, as by the act was required, and it appearing to him that presentment had been made, and payment refused, he issued his proclamation, declaring that all the banking powers and privileges of the Union Bank were forfeited. The plea states the facts which are said to constitute the forfeiture of the charter, and all the facts that are well pleaded are admitted by the demurrer. The demurrer does not admit that the charter was forfeited, but only the truth of the facts pleaded, and we are therefore to enquire whether the facts constituted a forfeiture of the corporate powers. This will de-

pend upon the provisions of the act of 1840, under which the forfeiture is pleaded, and also on the constitutionality of that act.

The act referred to is entitled, " An act requiring the several banks in this state to pay specie, and for other purposes." By the 8th section, it is provided that the several banks should pay their notes of the denomination of five dollars on the first day of April ensuing; their notes of ten dollars on the first day of July; their notes of twenty dollars on the first day of October; and notes of all denominations after the first day of January, 1841. The 9th section provides that in case of failure to pay as directed, the president, cashier, or teller should indorse such refusal on the note, which was to be equivalent to a protest, and evidence of a refusal to pay. The 10th section is in these words: "That whenever the governor, either from the certificate of the president, cashier, or teller, as aforesaid, or by affidavit of the holder of any such note, bill, or other evidence of debt, shall be satisfied that such presentment has been duly made, and payment refused, he shall forthwith issue his proclamation, declaring that said corporation has forfeited all its banking powers and privileges; a copy of which proclama_ tion he shall forward to such corporation, *after which such corporation shall retain and use its corporate name for the purpose of winding up and liquidating its affairs,* and for no other purpose whatever." The 11th section provides that whenever a corporation should be proclaimed to have forfeited its charter, two commissioners should be appointed, one by the president or stockholders, and another by the governor, to make out a schedule of all the effects of the bank, and also of her liabilities, a copy of which schedule was to be forwarded to the governor, for inspection of all concerned, and another copy to remain in the bank; and the 13th section declares that no dividend shall be made whilst the bank should be in a state of liquidation. These several provisions are all that are necessary to consider under the first plea.

Although much of the argument was directed to the provisions of this act and its constitutional validity, we must believe that it was done from a laudable zeal to discuss the whole case in all its possible aspects. Whatever I may think of the constitutional power of the legislature to impose restrictions, limitations and for-

57*

feitures on a bank, by an act subsequent to the charter, without the consent of the corporation, I cannot conceive that any such question is presented in the present case. The act does not profess to impose an absolute and instantaneous forfeiture of a bank charter for a failure to pay specie, but it declares that it shall work a forfeiture of "its banking powers and privileges." But again: the latter part of the 10th section declares, that, after such proclamation, "such corporation shall retain and use its corporate name for the purpose of winding up and liquidating its affairs, and for no other purpose whatever." Here is an express continuance of its corporate existence, for the purpose of winding up and liquidating its affairs. By its charter it had been authorized. to discount notes; its effects, therefore, necessarily consisted of bills receivable. The power to wind up its affairs necessarily reserved to it the power to collect all notes previously taken, either by suit or otherwise; for, without the power to sue, the power to wind up and liquidate amounted to nothing. If its legal remedy was taken from it, its rights were destroyed, and there was nothing, or but very little, to wind up. This note was given long before the act of 1840 was passed, and on any such note it has a right to sue. This power has not been taken from it. It is impossible that the legislature could have intended to take away its capacity to sue or be sued. If they had really done so, the note holders would have had the greatest right to complain; for there is no reservation in the act in favor of the creditors of the bank, except that which I have mentioned; and if the corporation was absolutely annihilated, the holders of the circulation were left without any remedy. *They* might well have complained that the act impaired the obligation of contracts. Admitting, then, that the act of 1840 is valid in all its parts, still there is nothing in it which prevented the plaintiffs below from suing on contracts previously made, and the matter pleaded in the first plea was, therefore, no bar to the action.

The second plea is, in substance, that the act supplemental to the charter of the Union Bank was not agreed to by a majority of each house of the legislature, and entered on the journals with the yeas and nays, and referred to the next succeeding legislature, after publication in the newspapers, according to the provisions of

the 9th section of the 7th article of the constitution; but that said supplemental act made material alterations in the original act, and was only passed by one legislature, and that no loan of money can be raised on the faith of the state without the assent of two legislatures, given in the manner presented by the constitution. On this point it is argued that the whole of any law by which the faith of the state is pledged, must be entered *upon* the journals, with the yeas and nays, and be published in the newspapers the required time, and that it must afterwards be submitted to the succeeding legislature for approval; and that, as the supplemental act is a part of the charter, by which material alterations are made, that the action of two legislatures was also necessary as to this supplemental act, and that, as it was only passed at the regular session of 1838, the whole charter is therefore unconstitutional and void. I shall, then, proceed to notice the constitutional provision, and to inquire, by an application of it to the bank charter, whether the position taken can be sustained.

The 9th section of the 7th article of the constitution is in these words: "No law shall ever be passed to raise a loan of money upon the credit of the state, or to pledge the faith of the state for the payment or redemption of any loan or debt, unless such law be proposed in the senate or house of representatives, and be agreed to by a majority of the members of each house, and entered on their journals, with the yeas and nays taken thereon, and be referred to the next succeeding legislature, and published for three months previous to the next regular election, in three newspapers of the state, and unless a majority of each branch of the legislature so elected, after such publication, shall agree to pass such law; and in such case the yeas and nays shall be taken and entered on the journals of each house."

The 5th section of the original charter provides, "That, in order to facilitate the said Union Bank for the said loan of fifteen millions five hundred thousand dollars, the faith of this state be and is hereby pledged, both for the security of the capital and interest," &c. It appears that the original charter, in which this provision is contained, was passed in accordance with the provision in the constitution. The supplemental act makes no alteration what-

ever in regard to this section. It changes, in some respects, the mere detail of the original charter, in the mode of carrying the corporation into successful operation, and authorizes the governor to subscribe for the stock on the part of the state. The object of the pledge is not changed; on the contrary, the supplemental act was passed in aid of the original design. In applying the constitutional test to the 5th section, I am not able to perceive any reason which to me seems sufficient to justify the conclusion that it is unconstitutional. The object of the framers of the constitution was doubtless to give the people an opportunity of judging of the policy and propriety of making a pledge of the faith of the state, and it would seem to be reasonable that enough of the law should be published to inform them as to the object. If this could be done by publishing one section alone, then the reason for requiring publication would be fully answered, as much so as it would be by publishing the whole law. The 5th section alone contains ample information on the object in view in making the pledge. Indeed it is the only part of the whole act which does declare for what purpose and in what manner the faith of the state should be pledged. By it the object was declared and the pledge made, and the manner and time at which it was to be fulfilled, fully specified. The people must have been as fully informed, for all useful purposes, by the publication of this section as by the publication of the whole act; so that the reason which operated in the formation of the constitutional provision, and which has been so strenuously contended for, as showing the necessity for publishing also the supplement, was fully secured. But there is no necessity for sustaining the publication of this section alone, since, for any thing that appears in this plea, the whole charter was published, and must be free from objection, unless it be contaminated by the unconstitutionality of the supplement. Let it be supposed, then, that the supplemental act was void, does it necessarily follow that the original act is for that reason also void? I cannot perceive how such a consequence would follow. That which is valid cannot be destroyed by that which is void. A void act can have no influence on a valid one; and if it be true, and it is not denied, that the original act would have been valid without the supplement, then it would seem to follow that its validity could not be

shaken by a void supplement. They are separate acts, and it would seem to be an anomaly in legislation, that a previous valid act could be destroyed by a subsequent void one. I am aware that acts on the same subject are to be construed together for the purpose of carrying out fully the provisions of such laws, but this is a mere rule of construction; but when their validity is attacked, then they may be considered as having a separate and independent existence. If one be void the other will not be affected, unless they be so essentially connected and blended together as to make one useless and inoperative without the other. But suppose we consider them as making but one law, does it then follow that, if the provisions of the supplement be void, the provisions of the first act are also lost? It undoubtedly does not. This, again, would depend on the connection or dependence of the several provisions. If part of the act can be carried out, and that part be constitutional, it must stand, and the portion which is unconstitutional must be rejected. Suppose the legislature were to make in one act an entire code of law, either with or without a title, and one section or one provision of that code should turn out to be unconstitutional, surely it would not necessarily follow that the whole code must for that reason be declared unconstitutional. The void would be separate from the valid, and that which was not unconstitutional would remain in force.

It is not at all uncommon for the courts of the country to declare a section or a provision in a law unconstitutional, and to retain and enforce the balance. Thus in the case of Thomson *v.* The Grand Gulf Railroad Company, 3 Howard, 240, this court held a single provision in the charter unconstitutional, but this did not induce us to declare the whole charter void. The same doctrine is recognized in the case of Sturges *v.* Crowninshield, reported in 4 Wheaton; and again in the case of the Bank of Hamilton *v.* Dudley's lessee, 2 Peters, 492, in which the constitutionality of an act of the Legislature of Ohio was questioned. In deciding the case, Chief Justice Marshall remarked, that " if any part of the act be unconstitutional, the provisions of that part may be disregarded, while full effect will be given to such as are not repugnant to the constitution of the United States, or of the state, or to the ordinance of 1787." It would then necessarily fol-

low, that, even if the supplement be void, the original act is not for that reason also void. It is not, therefore, material whether they be regarded as one law, or as different laws. If they be but one law, then the provisions which are unconstitutional must be rejected, and the remainder must be enforced or carried out. If they be regarded as separate laws, then the one must be, rejected and the other retained. The position taken by counsel necessarily destroys the force of the argument advanced, as will be seen by reference to the dates of the acts. On the 21st of January, 1837, the original charter was passed and approved. It was by the 47th section referred to the next legislature, and directed to be published as the constitution required, and it is not denied but what this was done. On the 5th of February, 1838, the act, as it had originally passed, without any alteration, was passed by the succeeding legislature, and approved by the governor. It then became a law, confessedly constitutional.

On this state of things let the mind for a moment pause and survey the past. Here is a bank charter constitutionally enacted by the legislature, and which must, therefore be valid. It is not void for ambiguity, or because it cannot be carried out. Its details are such as the legislature thought necessary and sufficient, and they have not been attacked. In this condition, things remained for ten days, but on the 15th of the same month, the legislature passed the supplemental act, and it received the approval of the executive, and this is the act which it is said is unconstitutional, and which, being so, must also vitiate the original act, after it had a constitutional existence for ten days, merely because the supplemental act professed to make alterations in the original act. Now, if this act be absolutely void, how, I would ask, can it interfere with a law which was valid, and which had been in force ten days before the void act was passed? If it was void, it could alter nothing; it had no constitutional being; it could not connect itself with the original law; it was powerless, and can present no impediment whatever to the validity of the charter. If, then, the position taken be the true one, we get clear of nothing but the supplemental act, and this does not interfere with the right of action. By the original act, the power to take notes and sue on them is fully provided for, and if that be valid, as I think I have

shown it to be, then the remedy is undoubted, and the plea presents no bar to the action.

The third plea is, that the note sued on was given for a loan of post notes, issued by the bank to circulate as money, when by the charter the bank could only issue notes payable on demand, and that the contract is void.

The charter is entirely silent as to what description of notes the bank should issue, and if we were to declare that they could only issue notes payable on demand, it would be engrafting a condition on the charter which its provisions would not authorize. By the ninth section, the subscribers for stock were created a body corporate, with power to hold property, and they were authorized "to loan, to negotiate, to take mortgages and pledges, and to discount on such terms and such securities as they should think proper." By the 18th section, it was provided that the bank should not issue any bill, note, or check, for less than ten dollars. Although the power is no where expressly given to issue notes of any description, yet it is clearly an implied power, arising from these two provisions. It was evidently the design of the Legislature that it should do so. This is manifested as well by the foregoing provisions, as by the nature of the institution which it was creating. It was designed that its discounts should be made in its own notes. Having, then, the power to issue notes and put them in circulation, there is no rule by which we can arrive at the conclusion that notes on demand were intended, and not post notes. It would be fair to construe the act in reference to the power exercised by similar institutions, as we may fairly presume such custom was known to the legislature. The custom of issuing post notes had previously prevailed with the banks both in this state and elsewhere, and the inference is, that the legislature intended to confer on this institution such powers as were generally exercised by banks. Certainly they authorized the bank to issue notes, and not having fixed the precise description of the notes it should issue, it is not with us to do so. Neither post notes nor notes on demand are money, nor can they in strictness be said to be the representatives of money. How can the notes of a bank be the representatives of its money, when it may issue three times as much in notes as it has in money? They are but

a substituted currency, circulated by legislative approbation, and for many purposes regarded as money, merely because they are used as a circulating medium. If, then, neither be money, post notes would constitute a consideration for a note given for them, quite as legal as would a note on demand. Both are but promissory notes, and they differ in nothing but in the time of payment. If one be a legal consideration for a contract, the other must also be. They may differ in their value, but this is not a question before us. Mutual promises constitute sufficient considerations the one for the other. It is but by common consent that bank notes circulate as money; the legislature has no power to declare them to be money; and if, by common consent, one description of note may be considered as money, so may another be. Perhaps it has not been as common for banks to issue post notes as notes on demand; but when issued, they have circulated as money in the same way that notes on demand have, and as the legislature was silent on this subject in the charter, their tacit consent may be implied; but, at all events, there is nothing which enables us to say that the bank had no right to issue such notes. Believing, then, that the bank had the power to issue post notes, independent of the subsequent act which conferred such authority, we have not thought it necessary to determine whether that act applied to the Union Bank or not. This plea is consequently bad.

The fourth plea is, in substance, that on the 8th of June, 1840, a majority of the stockholders of the bank assembled at the banking houses in the respective bank districts, and, by resolutions, refused to receive the state bonds issued in pursuance of the charter for the benefit of the stockholders, and that they also refused to permit the bonds to be sold for their benefit, but ordered them to be delivered up to the authorities of the state. That they were not, in truth, stockholders in the bank, and by the resolutions renounced their privileges as such. That they thereby surrendered the charter of the bank, and that the surrender had been accepted by the proclamation of the governor, in pursuance of the provisions of the act of 1840.

If any of the matter here pleaded would be a bar to the action, still the manner of pleading it would render it subject to the de-

murrer.   The plea sets up three distinct matters, which are repugnant and contradictory.

1st.  That the stockholders refused to receive the state bonds.

2d.  That they were not stockholders.

3d.  That they had surrendered their charter.

If they were not stockholders, they had no right to refuse the bonds, or to surrender the bank charter.   If they were stockholders, they could not divest themselves of that character by their mere resolutions.

We might leave this plea without further comment, but it is perhaps proper that we should give some consideration to the matter pleaded.   If the corporation could only exist on condition that the bonds intended for the benefit of the stockholders should be received by them, then this plea would present a question whether the corporation had not been dissolved by their refusal; but it was provided that the state should become a stockholder, and if the state has taken its stock, then the corporation may still exist. And again, whether the supposed stockholders were really so or not, still the state may be the only stockholder, (a question which the record does not enable us to decide,) and in that case the corporation was not necessarily dissolved.   And lastly, even if the charter was surrendered as the plea avers, and accepted according to the provisions of the act of 1840, still there is a saving in the 16th section of that act of all corporate powers, necessary for the liquidation of its affairs, and under this saving it may still sue for the purposes of collection.

The fifth plea is, that the post notes received on the loan had printed on them the words, "the faith of the state pledged," which was a material part of the contract; and it avers that the bank had not the right to issue notes pledging the faith of the state for their redemption.   The plea does not allege that the defendant was deceived or defrauded by this, nor does it allege that any deception was practised on him.   He was probably as well informed at the time he took the notes as he is now, that the bank had no right to make any such pledge.   It was a matter about which he is presumed to have been informed.   The faith of the state can only be pledged in a particular way, and when it is done, every

person is informed of it.   These words did not amount to a pledge of the faith of the state, and the defendant must have known that they did not, and I cannot perceive how this matter, pleaded as it is, could be considered as a bar to the action.

The last plea is, that neither the entire original charter, nor the fifth section thereof, was published for the length of time required by the constitution; but that the same were published in the Mississippian for eleven weeks only previous to the election, and in certain other papers only ten weeks, and that being an act pledging the faith of the state for the payment of money, it is void unless the constitution has been strictly followed.   The answer to this is, that it was only necessary to publish the charter, because by the fifth section the faith of the state was pledged for the payment of a contemplated loan; and if the charter may still exist without the aid of the fifth section, then the plea is bad.   We have already seen that part of a law may be valid and another part invalid, unless their dependence be such as necessarily to destroy both.   The fifth section is not a condition on which the charter depends, but it is a provision, merely, in aid of the general object.   The legislature had it in view to establish a bank, but it was evident that capital would be wanting to ensure their success. The bank was established by the first section, with a capital of fifteen millions five hundred thousand dollars, to be raised by means of a loan, to be obtained by the directors of the institution. To enable them to effect this loan, the state agreed to lend its aid; hence the fifth section declares, "that in order to facilitate the said Union Bank for the said loan of fifteen millions five hundred thousand dollars, the faith of the state be, and is hereby pledged, both for the security of the capital and interest."   The state, then, undertook to become responsible that the loan should be paid, but the stockholders were, by the 8th section, required to give mortgages on real estate, for the payment of the capital and interest; and although the governor was directed to execute the bonds to be given for the loan, yet the bank was required to pay the bonds at maturity.   That which is intended to facilitate or aid the subscribers for stock, cannot be regarded as a limitation or condition in the charter.   If the fifth section, and all others in relation to the pledge of the faith of the state, were stricken out, the charter

is still sufficiently perfect to be valid. Suppose the subscribers for stock had chosen to reject this aid, and had actually paid the amount of their stock in money, could their right to do so be questioned? It seems to me that it could not. The fifth section professes to do nothing more than to point out the means to accomplish the end, but it does not deprive the stockholders from accomplishing the end by other means. It is a proffer on the part of the state to become security for the stockholders, on condition of being indemnified by mortgage on real estate. Surely, then, this provision may be void without affecting the balance of the charter, and, if so, the plea was bad on demurrer.

I have thus examined the several pleas, and have endeavored to confine my remarks strictly to the questions presented by the record, with a view to avoid even an intimation of an opinion on any question which is not directly raised. My conclusion is, that none of these pleas, in the form in which they are presented, constitute a good bar to the action, and consequently the demurrers were properly sustained.

The judgment must be affirmed.